The SCHWARZENBACH–HUBER COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Textile Workers Union of America, AFL–CIO, Intervenor.

No. 130, Docket 32286.

United States Court of Appeals Second Circuit.

Argued Nov. 8, 1968.

Decided March 5, 1969.

Marshall C. Berger, New York City (Robert Abelow and Weil, Gotshal & Manges, New York City, on the brief), for petitioner.

Richard N. Chapman, Atty., N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence M. Joseph, Atty., N. L. R. B., Washington, D. C., on the brief), for respondent.

Daniel B. Jordan, New York City (Cornelius J. Collins, Jr., New York City, on the brief), for intervenor.

Before MEDINA and WATERMAN, Circuit Judges, and LEVET, District Judge.*

MEDINA, Circuit Judge:

Schwarzenbach-Huber Company, a textile manufacturing concern with its principal place of business in New York City, petitions this Court to review and set aside an order of the National Labor Relations Board and the Board cross-petitions for enforcement.

This case presents a sequence of events in a familiar pattern. The Textile Workers Union of America AFL-CIO used what is now commonly called the "representation" card method of obtaining the support of a majority of the production and maintenance workers in the Company's Juniata plant in Altoona, Pennsylvania. Claiming to have cards signed by a majority of the workers in the unit, the Union by letter of February 9, 1967 demanded a recognition of the Union and immediate collective bargaining. On February 13, 1967 the Union filed a petition for an election. On February 14, 1967 the Company by letter expressed its doubt that the Union represented "most or many" of its employees in the unit. The letter also joined in the Union's request for an election. On March 16, 1967 the election

was held and the Union lost by a substantial margin. Thereafter proceedings were instituted by the Union to set the election aside, to establish various alleged unfair labor practices by the Company and to order the Company, without any new election, to bargain with the Union. These proceedings were consolidated; and, after a hearing and findings by the Trial Examiner, the Board set the election aside, held the Company's doubt that the Union had a majority was not a good faith doubt, sustained *in toto* all the claims of unfair labor practices; and, finally, on the ground that the unfair labor practices were so outrageous and pervasive as to dissipate the Union's majority prior to the election and that they made any new election in the foreseeable future impracticable, the Board ordered the Company to bargain with the Union.

We hold that neither on February 9th nor at any time prior to February 14th did the Union have in its possession valid cards signed by a majority of its production and maintenance employees. We set aside as not supported by substantial evidence on the record as a whole the finding that the Company's doubt that the Union had in its possession cards signed by a majority of its production and maintenance employees was not a claim made in good faith. We sustain the Board's finding of two of the alleged unfair labor practices. As to the other findings of alleged unfair labor 'practices, we set them aside and refuse enforcement on the ground that such findings of unfair labor practices are not supported by substantial evidence on the record as a whole. We set aside and refuse to enforce the bargaining order as the Union did not have a majority, as the Company's doubt that the Union had a majority was made in good faith and as the making of a bargaining order under the circumstances of this case would clearly not effectuate the purposes of the Act.

* Of the Southern District of New York, sitting by designation.

## PART I

### *The Bargaining Order.*

■ The propriety of enforcing an order to bargain after a union has lost a representation election depends on the resolution of three questions: (1) whether the Union in fact had a majority; (2) whether the employer refused to bargain because of a good faith doubt of such majority, if the Union had a majority; (3) whether on all the facts of the election situation a bargaining order is an appropriate remedy for enforcing the policy of the National Labor Relations Act.

### A

### *Did the Union Have a Majority?*

■ The initial inquiry must, of course, relate to the number of employees in the unit. The Trial Examiner, all of whose findings were adopted by the Board, finds the unit was composed of 197 employees. This included Joan Iaia and Ruby Evans, to the inclusion of whom, says the Trial Examiner, the General Counsel "takes no serious exceptions." Indeed, there was no basis for any objection whatever, as these two women were classified as weavers, they spent most of their time on the floor operating the looms and only a part of their time teaching the others how to operate the looms. The name of Marjorie Krise is apparently omitted, as her name "does not appear on the eligibility list as prepared by the Company for the March 16 election." Mrs. Krise should have been included in the unit. The uncontradicted evidence is that she and her husband had worked in the plant for a long time. In November, 1966 she told the Company "I'd like a layoff for medical and personal reasons." While she considered her personal health a private matter, there is other evidence in the record to indicate that the layoff was due to an allergy she had for silk and silk was then being worked in the plant. In February of 1967 her husband noticed that certain jobs were indicated on the Bulletin Board and she told him that she was interested in going back to work and would he see Mr. Kozak, the Pesonnel Manager. He saw Mr. Kozak who said he would be glad to see her. This was reported to Mrs. Krise. She saw Mr. Kozak and went back to the plant on February 20th. She had previously worked as a creeler but came back in a different department as an examiner, clearly within the category of a production or maintenance worker. If the fact that her name was not on the eligibility list has any significance, it is sufficient to say that the eligibility list was prepared as of the period "ending February 11, 1967," prior to the time when Mrs. Krise came back to work. As the name of Joyce Jewell, who quit work after the preparation of the eligibility list was eliminated, it is clear that the name of Marjorie Krise should have been included.

■ Thus the unit becomes 198. The name of Vivian Becker, who was a regular worker but who was laid off temporarily in the early part of February because she had to find a new babysitter to take care of her children while she worked, should also have been included. This brings the total in the unit to 199.

■ The next consideration is the cutoff date. The Board concedes in footnote 20 on page 23 of its brief that "it does not rely on cards signed after February 14." [1] The Trial Examiner does

1. This "concession" seems to imply that cards "signed" on or before February 14 should be counted. Of course, the date of the signing of the cards has no significance. Many of the employees signed cards and retained them at home or in their pockets or elsewhere for periods of several days, as appears in the Appendix to this opinion. They did this, we have no doubt, because they had not yet made up their minds to make the cards effective by delivering them to the Union. The significant date is the date on which the signed card is delivered to the Union.

Moreover, in no event could cards delivered to the Union on February 14 be counted, as the Board itself has ruled that the cut-off date cannot be later than

not clearly state the fact that on February 9th, when the initial demand for recognition was made, the Union did not have a majority. But he finds that between February 9th and February 14th "4 additional employees signed representation cards," and he says the Union thus "obtained a majority of 103 cards out of a total of 199 unit employees, even assuming that Becker and Krise are to be included in the unit." This is on the theory that the Union's demand was of a continuing nature.

██ We hold that under the circumstances of this particular case the cut-off date is February 9, 1967, when the letter claiming a majority was sent by the Union. Since we find, as is disclosed in the ensuing discussion, that the Union had no majority on February 9, 1967, a compelling reason for this ruling is afforded by the fact that Frazier directed a wholesale distribution of copies of this letter at the plant gates on February 10. The intended effect of this widespread diffusion of the Union's false claim that it had a majority was undoubtedly to bring the reluctant sheep into the fold by telling them the fight was over, the Union had won and they might as well get on the bandwagon. No cards handed to the Union after the making of such a misrepresentation could possibly be deemed valid.[2]

We turn to the cards. During the oral argument of this case we made a request that the cards be sent to us. When they arrived they had been thoroughly shuffled and scrambled. It did not seem possible to arrange them in a meaningful way. But continued study of what appeared on the face, and what appeared also on the reverse side of each card, finally led to a solution which perhaps we should have noted in the beginning. The key to the cards is to be found in the symbol appearing on the reverse side of each card on the right near the top. When these cards are arranged in sequence from 1 to 122, in accordance with the symbols appearing on the reverse side of the cards, we can get a completely dependable factual pattern of the order in which the cards were counted. So that this may be checked by any interested person, we have added as an Appendix to this opinion a complete list of the 122 cards, arranged in the order just above described, together with the data appearing both on the face and on the reverse side of each card, including the date and time of filing with the Board.

The Examiner finds that the 4 additional employees above referred to are represented by cards numbered 101, 96, 100 and 102 and. he thus reaches the erroneous conclusion that the Union had 103 cards on February 14, 1967. Card No. 96 is particularly interesting. It is the card of Helen McKendree. The date is "2 1967." It was received at the plant gate on February 10, 1967 at the very time that copies of the Union's letter claiming a majority were being distributed. But it is erroneously given the number 96. It could not properly be counted as constituting one of the majority referred to in the letter of February 9th as the card was not received by the Union until February 10th. By some strange method of computation the Hearing Examiner counted this card as one of the "99 cards" he says were held by the Union at the time of the demand. And he counted this card again as one of the "4 additional employees." The correct number of cards in the possession of the Union on February 9, 1967 was 98.

The other 3 supposedly "additional" cards are also interesting. Card No. 100 was signed by Maury L. Delozier on February 13 but it was not delivered to the Union until February 21. This is after the cut-off date, so we still have only 98. Card No. 101 was signed by John Biancone on February 14 and de-

---

the day before the date of the refusal to bargain. Gotham Shoe Manufacturing Co., 149 N.L.R.B. No. 80, enforced, 359 F.2d 684 (2d Cir. 1966).

2. See N. L. R. B. v. Philamon Laboratories, Inc., 298 F.2d 176, 179–180 (2d Cir. 1962) ; N. L. R. B. v. H. Rohtstein & Co., 266 F.2d 407 (1st Cir. 1959).

livered to the Union on the same day. This was too late; we still have 98. Card No. 102 was signed by Calsie D. Gearhart on February 11 but was not received by the Union until February 13, after the cut-off date of February 9, 1967.

■ Accordingly, we are compelled to conclude that on the cut-off date of February 9th the Union did not have a majority. And this remains true even if Krise and Becker are not included in the unit.

B

*Are Many of the Cards Vitiated by Deceitful and Fraudulent Misrepresentations by the Union?*

The chief professional union organizer was Carl Frazier, an International Representative of the Textile Workers Union. Working as his lieutenant and next in command was James Meyers. 35 cards were signed at the meeting of January 29, 1967. A few were signed at later meetings sponsored by the Union. Most of the cards were obtained by personal solicitation, which varied from visits to the homes of the workers to the passing out of the cards with or without an explanation of their purpose.

A very considerable number of those who signed the cards testified at the hearing. The result, however, was that the Trial Examiner counted all 122 cards which he characterized as "an overwhelming majority." The way this was done can be described as nothing short of extraordinary. Relying on Cumberland Shoe Corp., 144 N.L.R.B. 1268 (1963), enforced, 351 F.2d 917 (6th Cir. 1965) and Joy Silk Mills, Inc. v. N.L.R.B., 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), the Trial Examiner held that unless a card signer had been told that the "sole" or "only" purpose of the card was to obtain an election, the signing of the card was a sufficient demonstration of an intention to appoint the Union as bargaining agent and that there was thus established an irrebuttable presumption which could not be neutralized

by any testimony by the employee as to what he or she understood by the various representations made by Frazier or the other Union solicitors. In one or two instances where the testimony indicated that the representation was that the "sole" or "only" purpose of the cards was to get an election, the Trial Examiner accepted these cards also, as he found the testimony not credible.

■ We turn first to the 35 cards signed at the meeting of January 29th. Frazier himself testified that he read the entire printed matter on the card, word for word, and that he made the following representations at the meeting of January 29, 1967: (1) if the Union lost the election the cards would be returned; (2) that the Union must have 30 per cent "of the people" before the Union can petition for an election; (3) "there has to be 51 per cent of the people vote for a Union." There was considerable testimony by employees to the effect that they were told that by signing the cards they would save $5. This seems to have been on the theory that, as no payment whatever was necessary to validate the card, they would save the payment of the initiation fee or dues generally required. What Frazier omitted to tell those present at the meeting is similarly established by Frazier's testimony that he did not tell those present that, even if the Union lost the election, it could still demand recognition and the right to bargain upon the basis of the cards. That he knew this to be so is clear from his testimony that, while he made no such statement at this particular meeting, he did make such a statement at other meetings. We think these flagrant misrepresentations and this wilful omission were deceitful and that the effect of making them was to perpetrate a fraud on those present at the meeting who signed the cards.

While none of the employees was permitted to testify to what these misrepresentations meant to him, we think the inference is perfectly plain. Each man present at the meeting must have concluded: "we employees are not accept-

ing Union membership unconditionally. If there are enough cards to get an election, and an election takes place, I can vote for the Union or against the Union as I choose. And, if the Union wins, I save $5. If the Union loses, that is the end."

Frazier was especially emphatic in insisting that he had never said to anyone, at the meeting or anywhere else, that the "sole" or "only" purpose of the cards was to obtain an election.

Thus because of these flagrant misrepresentations and this wilful concealment, we have no alternative other than to invalidate the entire 35 cards signed at the meeting of January 29th.

Against this background it is, we think, of no significance that none of the signers of any of the cards demanded the return of his card by the Union. The *ex parte* action of the Union in sending union membership cards and union literature to each person who signed a card is likewise of no significance in the light of the representations made by Frazier.

To cover the matter of the cards more thoroughly we specifically invalidate the cards of six employees. Three of these, Jonas Corbin, Jr., William Slone (whose card was erroneously recorded by Frazier as Stone) and Walter Delozier, attended the meeting on January 29, 1967. The other three, William Nolan, Ronald Taddy and Patrick O'Hara, so far as appears, did not attend the meeting of January 29, 1967.

Jonas Corbin, Jr. was an active supporter of the Union who, after signing his card at the meeting, distributed cards to other employees and urged them to sign for the Union. He was asked what Mr. Frazier said at the meeting:

A. Mr. Frazier said that the cards were—that we were signing the cards so that we could get an election down at the plant.

Q. Did you ask any questions? A. Yes, sir.

Q. What was the question you asked? A. I asked why, I asked why it said on the card that we were signing to become a member of the Union; I asked whether we were actually a member of the Union, were they going to collect dues from us if the Union wasn't voted in and Mr. Frazier then told me, he said, "No, you will get your card back if the Union isn't voted in."

Q. Did he answer your question in any other way? A. To the best of my recollection, all he wanted was to get 30 per cent of the cards signed, 30 per cent of the people to sign blue cards so we could get an election.

He also testified that after the meeting as people were picking up and signing the blue cards, "the word came to me" that the people signing before the election "would save five bucks."

His understanding of what the cards meant is demonstrated by his statement, in turn, to those ten people to whom he distributed cards:

Q. Did you tell them anything about the purpose of the cards or what they meant? A. I told them that we had to sign 30 per cent of the people in the plant before we could even get an election and get the thing over with one way or another.

Clearly, the expectation that Corbin generated and that Frazier had generated in Corbin was that there would be an election to "get the thing over with one way or another." If the Union lost, the cards would be returned and no dues would be owed; if it won, an early signing would have saved five dollars. Signing the cards was meant to bring an election. To gain signatures by telling the employees that there would be an election, without also telling them that the cards alone might be used to gain representative status, is a sufficient misrepresentation to invalidate the cards. When the employees were told, in effect, that they had nothing to lose by signing and could, by signing, save money and get an election to "get the thing over," this indicates that there was no intention to unconditionally authorize the Union as the representative of the workers.

William Slone attended the meeting and signed his card there. He testified that at the meeting "they said they needed 30 per cent of the cards to have an election," also that by signing the card the initiation fee would be saved. He specifically remembered Frazier stating: "if the Union was not voted in, that these cards would be returned to you in the mail." In obvious reference to the election, he recalled that Frazier had said: "We need cards to get the ball rolling."

Walter Delozier recalled that when Frazier was asked at the meeting about the language on the cards that says "you belong to the Union when you sign it," he replied: "This is just to get the show on the road, so we can get a vote in your plant." When pressed on cross-examination he recalled an even stronger statement:

> Q. What did Joness (sic) Corbin say at the meeting that you attended? What questions did he ask Frazier? A. He stood up and said, "I have a question" and he said, "O.K.," and he said, "Is this card just to get a vote in the plant or company?" He said either one, I don't know which.

> Mr. Frazier said, "Yes, it is." But it doesn't say that on the card. Then he explained that it only takes 33 per cent of these cards to get a vote and the question was dropped right there.

As Delozier testified succinctly: "I read the card but I took Frazier's word."

When we turn to the testimony of employees who did not sign at the meeting of January 29, 1967, we find the same pattern of misrepresentation, half-truth and evasiveness by the Union organizers.

William Nolan had signed a card at his home. When asked what Harry McGraw, who had given it to him, said, he replied:

> A. He said they had to have a certain percentage to join the Union, to get a Union started.

Q. Did he say anything about an election? A. Yes, he said there would be an election.

He also recalled that he had been told that the Union needed 30 per cent of the cards to get the Union started and bring about an election. The single, positive representation that there would be an election, without any indication that cards alone could bring in the Union without or despite an election, is sufficient to invalidate this card.[3]

Ronald Taddy was given a card by James Meyers, Frazier's assistant. When he asked Meyers about the card, Meyers replied that they had to have 30 per cent to have an election. When pressed on cross-examination, as to whether he had been told that signing the card "would help you get the Union," he replied instead that "It would help us get an election." He testified that Meyers had said nothing to him about dues but that "it was rumored around the mill—" and then he was cut off.

Patrick O'Hara was told:

> A. Well, it would save you the first year's fee and that they would use the card to get the majority of the cards signed, you know, but it was to get a vote going in an election.

Guella also told him that the first year's fee was five dollars, and that "the purpose of the card was to have enough cards to get a vote." When he was asked if he had ever asked for his authorization card back, he responded:

> A. No, I didn't. May I ask one thing? I was under the understanding when I received—.

He was not permitted to testify to his understanding but from the testimony in the record, it is clear that he like the others thought that signing the card would bring an election and, if the Union succeeded in the election, would save dues for a year.

We specifically invalidate the cards of Jonas Corbin, Jr., William Slone, Walter

---

3. N. L. R. B. v. S. E. Nichols Co., 380 F.2d 438 (2d Cir. 1967).

Delozier, William Nolan, Ronald Taddy and Patrick O'Hara.

We do not find in the testimony of these witnesses the "conglomeration of self-contradictions and inconsistent statements" to which the Trial Examiner makes reference. On the contrary, the testimony of these witnesses is clear and entirely consistent with the testimony of Frazier as described in Part I B of this opinion.

### C

#### The Aftermath and the Balance of the Cards.

As the Board in its brief, footnote 20 on page 23, states: "the Board does not rely on the cards signed after February 14," no explanation is required of the large number of cards that came into the possession of the Union thereafter. But the Hearing Examiner counted all 122 cards. So, for the sake of completeness, we shall go into the question of how the Union procured this large number of cards.

It will be recalled that, despite the demonstrable lack of a majority on February 9, the Union distributed at the plant on February 10 copies of the letter of February 9 asserting the Union's false claim that it possessed a card majority on February 9. The effect of this additional misrepresentation is shown in the Appendix. Indeed, this new maneuver worked so well that the Union on March 3, 1967 mailed the following letter (Respondent's Exhibit 22–a) to each employee who had not already signed a card:

TEXTILE WORKERS UNION
OF AMERICA
Affiliate of the AFL–CIO and CLC
1060 BROAD STREET
NEWARK 2, N. J.
March 3, 1967

Dear Friend:

We have just received the complete list of Schwarzenbach-Huber employees from the Labor Board. According to our records, you have not signed a Textile Workers Union Membership Authorization Card.

We regret that we could not write to you sooner because our mailing list was not complete.

With the Secret Ballot Election just a few days away, we want to take this opportunity to invite you to join with the MAJORITY of your co-workers who have already signed Union cards.

The Textile Workers Union and your TWUA Local UNION is open to all Schwarzenbach-Huber employees. The TWUA is here to help all Schwarzenbach-Huber workers—not just a select group.

Even though we are confident of victory, since a MAJORITY have pledged to support our Union—you know as well as we know that a big Union vote will mean a strong local union at Schwarzenbach-Huber—which will result in HIGHER WAGES, MORE BENEFITS and BETTER WORKING CONDITIONS for YOU, The WORKERS!

Be a chartered member before the election—please come to the planned rally that will be held before the election.

REMEMBER—"IN UNITY THERE
IS STRENGTH"
Fraternally yours,
/s/ CARL E. FRAZIER
Carl E. Frazier,
Int'l Representative

### D

#### The Law.

It may be doubted that the courts deciding *Cumberland*[4] and *Joy Silk*[5] ever intended the rules enunciated in those cases to be applied "so woodenly" as the Board did in this case and others, to use the expression of Judge Wisdom in N. L.

---

4. Cumberland Shoe Corp., 144 N.L.R.B. 1268 (1963), enforced, 351 F.2d 917 (6th Cir. 1965), *supra et passim.*

5. Joy Silk Mills, Inc. v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), *supra et passim.*

R. B. v. Southland Paint Company, 394 F.2d 717, 725 (5th Cir. 1968). See the reinterpretation of *Cumberland* by the Sixth Circuit in N. L. R. B. v. Swan Super Cleaners, Inc., 384 F.2d 609 (6th Cir. 1967). In any event this *per se* approach has been very generally criticized [6] and the rulings of these two cases have suffered much erosion.[7] In this Circuit the *Cumberland* rule has been rejected. Bryant Chucking Grinder Co. v. N. L. R. B., 389 F.2d 565 (2d Cir. 1967) concurring opinion of Judge Friendly, at page 569, citing N. L. R. B. v. S. E. Nichols Co., 380 F.2d 438 (2d Cir. 1967).

■ The *Nichols* rule, at page 444, is succinct and comprehensive:

> The decisive question is whether the employees "meant to make the Union their representative" or instead "understood the cards not to be votes for the Union" but rather requests "that an election should be called at which they would vote for or against the Union as they then pleased."

And again, at page 445:

> Employees * * * who were willing to be represented by a union if the employer acquiesced on a showing of a majority might well not cavil over the union's being able to force recognition without an election if the employer did not. It is quite a different matter to permit a union to attain recognition by authorization cards procured on the affirmative assurance that there would be an election without a further clear explanation that the cards can and may also be used to obtain recognition without any subsequent expression of preference by the employees; such a half-truth gives the employees the false impression that they will have an opportunity in all events to register their true preferences in the secrecy of the voting booth.

■ This would also seem to make it improper in cases to come before us in this Circuit to exclude evidence of understanding and intention as held in *Joy Silk*. Thus, whether an ambiguity appears on the face of the card, or as the result of a statement made by the union solicitor, and in all cases of misrepresentation and omission such as we have in this case, the burden rests on the General Counsel to establish by a preponderance of evidence that the signer of the card intended to do more than merely to indicate his desire that there be an election to decide whether or not the Union should be the bargaining representative of the employees in the unit. See N. L. R. B. v. Peterson Brothers, Inc., 342 F. 2d 221, 224 (5th Cir. 1965). Without such proof the cards subject to such infirmities must be discarded as invalid.

The cases indicate that the cards used by the various unions are worded dif-

6. See Lesnick, Establishment of Bargaining Rights Without an NLRB Election, 65 Mich.L.Rev. 851 (1967); Comment, Refusal-To-Recognize Charges under Section 8(a) (5) of the NLRA: Card Checks and Employee Free Choice, 33 U. Chi.L.Rev. 387 (1966); Note, Union Authorization Cards, 75 Yale L.J. 805 (1966). See also, R. Winter, Judicial Review of Agency Decisions: the Labor Board and the Court in 1968 The Supreme Court Review 53 (P. Kurland ed. 1968).

7. See, e. g., N. L. R. B. v. Texas Electric Cooperatives, 398 F.2d 722 (5th Cir. 1968); Benson Veneer Co. v. N. L. R. B., 398 F.2d 998 (4th Cir. 1968); N. L. R. B. v. Lenz Co., 396 F.2d 905 (6th Cir. 1968); N. L. R. B. v. Southland Paint Co., 394 F.2d 717 (5th Cir. 1968); N. L. R. B. v. Lake Butler Apparel Co., 392 F.2d 76 (5th Cir. 1968); N. L. R. B. v. Arkansas Grain Corp., 390 F.2d 824 (8th Cir. 1968); N. L. R. B. v. Dan Howard Mfg. Co., 390 F.2d 304 (7th Cir. 1968); Crawford Mfg. Co. v. N. L. R. B., 386 F.2d 367 (4th Cir. 1967), cert. denied, 390 U.S. 1028, 88 S.Ct. 1408, 20 L.Ed. 2d 286 (1968); N. L. R. B. v. S. S. Logan Packing Co., 386 F.2d 562 (4th Cir. 1967); N. L. R. B. v. Swan Super Cleaners, Inc., 384 F.2d 609 (6th Cir. 1967); N. L. R. B. v. Southbridge Sheet Metal Works, Inc., 380 F.2d 851 (1st Cir. 1967); Engineers and Fabricators, Inc. v. N. L. R. B., 376 F.2d 482 (5th Cir. 1967); Bauer Welding and Metal Fabricators, Inc. v. N. L. R. B., 358 F.2d 766 (8th Cir. 1966).

ferently. Some of them, as mentioned by our Brother Friendly in a footnote to his opinion in *Nichols*, 380 F.2d at page 442, contain in the printed matter a statement that the signer of the card accepts membership in the Union. Such a statement appears on the cards used by the Union in this case. In the context of the misrepresentations and omissions by the Union representatives and solicitors in this case we think the precise wording of the printed matter on the cards cannot change the result in those instances where we have invalidated the cards.

E

*Was the Company's Claim That the Union Lacked a Majority Made in Good Faith or in Bad Faith?*

██ From the background we have already sketched it would seem that any doubt concerning the Union's majority would have been clearly justified as made in good faith. It was Brooks Taylor, the plant manager, who wrote the letter of February 14th, in which it was stated that the Company doubted the Union's majority status as asserted in its letter of February 9th. This letter was prepared after consultation with the Company's counsel in New York who either supplied the wording of the letter or the contents before it was written.

In the part of his decision stating his reasons for rejecting the Company's claim of a good faith doubt that the Union had in its possession cards signed by a majority of the employees and could prove it, the Trial Examiner quotes the following excerpt from Taylor's testimony:

Q. Isn't it true that you received General Counsel's Exhibit No. 8 [the Union's demand letter] on February 10, Friday? A. I believe so, yes.

Q. What was the first thing you did when you got that letter? Didn't you contact your attorney in New York? A. Probably, yes.

Q. I show you General Counsel's Exhibit No. 9, which is a letter signed by you written to the Union dated February 14, 1967, and ask you that isn't it true that your attorneys either gave you the wording or the contents of that letter before you wrote it? A. Yes.

One would suppose that this indicated disapproval by the Trial Examiner of the seeking of legal advice by an employer. But the Board, in footnote 1 to its decision, says:

Respondent asserts in its brief that the Trial Examiner relied on the fact that the Respondent consulted its attorney before replying to the Union's request for bargaining in finding that Respondent had no good-faith doubt of the Union's majority status. We do not believe that the Trial Examiner relied on the fact that Respondent consulted its attorney, nor do we.

This is not the first time this has happened. We wish to make it plain that employers as well as unions have a perfect right to consult their lawyers. That is what lawyers are for. If consultation with counsel indicates anything, it shows a desire to conform with legal requirements, to obey the law. It is quite reprehensible and wrong to insinuate, or to imply or to state that an adverse or damaging inference or deduction is to be made from the fact that an employer consults his lawyer in connection with any matter involving the relationship between an employer and his employees or a Union or in connection with any labor dispute or controversy.

██ To back up his contention that the Company's doubt of the Union's majority status was genuine Taylor testified to a number of significant circumstances that had come to his attention, some of which were hearsay. As he was testifying to his own state of mind, this hearsay was clearly admissible. Thus he said that he heard the Union started organizing not in late January, as asserted by the Union but in October or November, passing out a pamphlet which had a detachable card on the back that persons could cut out and return to

the Union expressing their interest. He also heard of meetings on Sunday afternoons in November and December but heard there never were more than 17 present and the earlier effort seemed to have died down. He heard about the meeting in late January and thought there were about 35 to 40 persons there, most of whom signed cards. As he calculated, adding this number to the 17 who had attended meetings in November or December, would bring it up to about 45. This was an inconsiderable number in view of the size of the unit. He also testified that the Company had many older employees who had been with the Company at the time this very Union had gone through prior elections, which the Union had always lost. He also testified that he heard that cards were being signed by employees just "to get people off their backs" and he did not feel that they were signing "without this pressure on them."

 Taylor's doubt was not rejected because the Trial Examiner did not believe him. Indeed, his testimony was direct, responsive and frank, so far as we can tell from the record. The rejection by the Trial Examiner of the Company's alleged good faith doubt seems to be based on some theory of punishment for the alleged unfair labor practices which, even though most of them happened after the period February 9—February 14, are supposed to evidence a determination "to gain time in which to dissipate that majority." A finding based upon any such theory cannot stand. Moreover, the Trial Examiner erroneously placed the burden of proof to "demonstrate the good faith required to justify his failure to bargain" upon the Company.[8]

These alleged unfair labor practices will be discussed in detail later in this opinion. It will suffice to say now that we find most of them not supported by substantial evidence on the record as a

whole. The two that we do sustain and will enforce relate to the Clyde Brown incident which happened on February 21st and the formation of the Committee in violation of Section 8(a) (2) which took place after the election.

That the Board's rejection of the Company's good faith doubt finds no substantial support in the record as a whole is further demonstrated by some of the reasons given by the Trial Examiner for rejecting it.

On February 2nd Walter Delozier, Rodger Trotter and Donald Craig came in and told Taylor that many employees were signing cards because they were tired of being pressured both at work and at home to sign the cards and because they were tired of listening to pro-Union and anti-Union discussions at every turn. On the advice of his counsel Taylor made a memorandum which is Respondent's Exhibit 5, signed by him and also signed by Delozier, Trotter and Craig. A somewhat similar memorandum is Respondent's Exhibit 6 dated February 7th. These memoranda are given no weight by the Trial Examiner because they are "largely self serving" and because they are not corroborated by the employees "who supposedly were so pressured." The fact that the memoranda, prepared on the advice of counsel to serve as corroboration and to refresh Taylor's recollection, are self serving is a strange sort of objection. Of course, they are self serving and their validity depends only upon Taylor's credibility, which is unquestioned on the point of good faith and which is corroborated by the signatures of Delozier, Trotter and Craig. At least as to the signature of Walter Delozier this can be compared with the signature on his card. Moreover, there is ample testimony in the record that pressure was brought to bear on many of the employees.

The Hearing Examiner adds as a further reason that the employee wit-

8. Lane Drug Co. v. N. L. R. B., 391 F.2d 812 (6th Cir. 1968) ; Textile Workers Union v. N. L. R. B., 386 F.2d 790 (2d Cir. 1967) ; N. L. R. B. v. River Togs, Inc., 382 F.2d 198 (2d Cir. 1967) ; N. L. R. B. v. Great Atlantic & Pacific Tea Co., 346 F.2d 936 (5th Cir. 1965) ; Hercules Packing Corp., 163 N.L.R.B. No. 35 (1967) ; Aaron Bros., 158 N.L.R.B. 1077 (1966).

nesses produced at the hearing had been first interviewed by counsel for the Company only a few days before the hearing. The Trial Examiner evidently thought that counsel should have interviewed the employees some time in February or March. Had he done so, it is easy to imagine that this would have been alleged as another unfair labor practice. This is just another instance of the "damned if you do, damned if you don't" approach by the Board that we criticized in N. L. R. B. v. Dorn's Transportation Company, Inc., 405 F.2d 706, at p. 715, decided January 9, 1969. Moreover, when the interviewing was done, scrupulous care was taken to advise the persons interviewed that they were not required to answer the questions if they did not wish to and that whatever they said would have no effect whatever on their continued employment.

■ A further argument on the good faith issue is that the Union in its letter of February 9, 1967 offered to prove it had a majority and the Company did not accept this offer. A similar argument is found in Board rulings and court opinions in many cases of the same type as the one before us. We hope this opinion will help to expose the unreality and complete futility of such alleged offers to prove possession of a card majority. Of course the Union does not mean that it proposed to let the employer see the original cards and do its own counting. If the Union had meant to propose a cross-check by the employer, it would have said so. If what is meant is to submit the cards to some impartial person for a count, where could such a person be found with the requisite knowledge and experience to make a proper count, in view of the fact that the count as made by the Board itself was full of errors, miscalculations and ambiguities, as we have already demonstrated? How would the impartial person, perhaps a priest, a minister or a rabbi, know whether to go by the dates on the face of the cards or the dates on the back? How would be know the correct number of persons in the unit? If he counted

as of February 9, 1967, which is the most natural date to select, he would come out with the answer that the Union did not have a majority. Above all, how would he know what representations had been made, and what relevant factors had been concealed by the union organizers? The whole thing is absurd. The plain truth of the matter is that the offer of proof is of no consequence whatever in this case. The employer had no alternative other than to disregard it.

While the Trial Examiner concludes that the asserted reasons for withholding recognition "have no basis in fact," we are of a contrary view.

### F

*Is the Bargaining Order in This Case an Appropriate Remedy for Enforcing the Policy of the National Labor Relations Act?*

What do all these miscalculations and errors of fact and law by the Board add up to? Surely they do not support the widely held supposition that the Board and the Trial Examiners have a special expertise to handle this type of case. This "representation" card business is an abomination. As presently administered it is a pro-Union device that serves no other purpose than to afford a method by which elections can be bypassed and the Unions ushered in without giving the employees individually or collectively any voice in the matter. And this is accomplished by the invention of new *per se* rules of evidence and new standards by which the proofs are to be evaluated, that fly in the face of common sense and elementary concepts of justice and fair play.

The very keystone of the Act is Section 7.

#### Rights of Employees

Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities

for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3).

 The invention and implementation of a scheme by which employees can be befuddled into thinking they are asking for a free election at which each can cast a secret ballot either for or against the Union, whereas they are in fact held to be signing away this very right without knowing they are doing so, seem to us to be a clear violation of Section 7. By the same token the bargaining order in this case nullifies the beneficent purposes of the Act and in no possible way can be said to effectuate the purposes of the Act. The forgotten man seems to have been the employee who was one of those who comprised the unit of production and maintenance workers in the Company's Juniata Plant.

### PART II

#### The Unfair Labor Practices.

We sustain and will enforce the Board's finding of a Section 8(a) (1) violation for having reprimanded employee Brown for Union activities during working hours, and we also sustain and will enforce the Board's finding of a Section 8(a) (2) and (1) violation for establishing, and then dominating and supporting the Employee Committee after the election. We set aside and refuse to enforce all the other findings of unfair labor practices by the Company as not supported by substantial evidence on the record as a whole. Each of these findings will now be discussed in some detail.

#### A.

#### The Meetings With Small Groups of Employees.

Some weeks before the election, and with the election in mind, the management of the Company decided to hold a series of meetings with small groups of the employees, sometimes with 5 to 7 employees, sometimes with as many as 8 to 10 employees in attendance. The issue is whether or not the discussions at these meetings interfered with, restrained, or coerced the employees in the exercise of their Section 7 rights.

 In this Circuit the controlling authority is Bourne v. N. L. R. B., 332 F.2d 47 (2d Cir. 1964), where we held, at page 48: "Under our decisions interrogation, not itself threatening, is not held to be an unfair labor practice unless it meets certain fairly severe standards." Five factors are frequently relevant: (1) whether there is a record of employer hostility; (2) is the information such as to have a potential use against an individual employee; (3) the identity of the questioner; (4) is there unnatural formality in the place and manner of interrogation; and (5) the truthfulness of the replies.

Before applying these standards it is well to bear in mind that the meetings with small groups of employees were dialogues rather than interrogations. What management was trying to accomplish had a double aspect: (1) to ascertain from the employees what their gripes and complaints were; and (2) in the context of a discussion of what the employees thought the Union could do for them in the light of these complaints, to counter the arguments put forth by the Union in its books and pamphlets and by word of mouth. The employees had no reluctance to voice their complaints. Indeed, in many instances these were stated with some enthusiasm. Randy Thompson, one of the members of the Union Committee and a strong Union supporter, testified that the method pursued by Taylor was to read from a book that had been passed out at the gate by the Union "something about the booms are dropping," and then comment on what he had read in order to give the Company's point of view on the particular subject covered by the quotation. Naturally and properly the Company took the position that the employees should cast their secret ballots for the Company

and against the Union. Under these circumstances, assurances against reprisals would have been wholly inappropriate. Moreover, the fact that the discussions were held with small groups rather than with individuals is a further support for the Company's position.

We proceed to apply the *Bourne* standards:

(1) In this case there is no record whatever of hostility to the Union.

(2) There were no threats, direct or indirect, to discharge any employee nor was any employee discharged. Indeed, we can find nothing in this record to support the view that any of these dialogues was designed to probe for information that could be used against any of the employees. There was no grant of benefits to the employees.

(3) Those who conducted these discussions varied, generally Taylor, the Plant Manager or Vice President Elden or both were present. Lewis and Rabenstein were also present at some of the meetings. Lewis was the training manager and foreman of the third shift. Rabenstein was standards engineer and responsible for the "method time measurement" system. Both were properly found by the Board to be supervisors. Taylor, Lewis and Rabenstein were in constant day-to-day contact with the employees, Elden also but to a lesser degree. There is no indication that any one of these three appeared as a formidable personality who was held in awe by any of the employees. The discussions appearing in the record seem to have proceeded on the part of the employees in a natural and quite candid and uninhibited way.

(4) As above indicated the dialogues proceeded in the most informal manner. But the place where they were held was the subject of extended testimony and discussion at the hearing. This was because the Union was trying to make it appear that the room had the stamp of high-level management and discipline upon it in such fashion as to overawe the employees. While in one sense this room could be called the conference room, this is only because there was in it a conference table surrounded by 8 chairs. In fact the employees were constantly in and out of this room, as it contained the desks of Grossman and Kozak, a sick room or dispensary, the Xerox machine and certain files. It seems to us that the only reason this room was chosen for the meetings is that it was the most convenient room in which to hold such discussions. This was a familiar and reasonably quiet area and it was certainly not a clearly demarked, seldom-entered management province.

(5) The truthfulness of the replies to questions is supposed to indicate the fear or lack of fear or inclination to evasion experienced by the employee. Here the readiness of the employees to discuss their gripes dispels any notion of fear. The whole atmosphere is epitomized in employee Melvin Kintz, Jr.'s testimony that, at one of these meetings he was asked why he needed a union to speak for him since he spoke so well for himself, and he replied that it didn't matter how well he spoke for himself if nobody in authority would listen.

■ The finding of interference, restraint or coercion of employees by these group meetings is wholly unsupported by substantial evidence on the record as a whole. Indeed, unless an employer can in some such fashion as in these group meetings put its side of the case before its employees just prior to an election, the Union with its professional organizers such as Frazier and Meyers, and its books, leaflets and pamphlets, would have the field to itself.

**B**

*The Alleged Threat to Close the Plant.*

This is the most serious and the closest issue, before us. Schwarzenbach, the President of the Company, had not, at least for some years, addressed his employees. In what he had every reason to suppose was a critical hour he addressed them in several shifts a few days before

the election. Here are some excerpts from his speech:

> To say I am concerned about the future of the mill is putting it mildly.

That he had invested a lot of money in the plant, that he could easily sell it or lease it to a company like Sylvania.

That it was an old company, which had been in the area for a long time, that the plant had gotten along without a union, and that if the Union got in or failed to get in "they were going to try and make a go of it either way."

A few employees testified that Schwarzenbach said he would try to keep the plant going if the Union won, but he didn't see how he could do it.

Schwarzenbach also made reference to the permanent closing in 1953 of the Altoona Rayon plant.

On March 2, 1967 the Company issued to its employees a single-sheet cartoon showing a sketch of its Juniata plant with the following in large print:

> We have, here in Altoona, one of the finest textile mills in the world * * * South Carolina not excluded. (Don't let's wreck it now!)

Below this heading is a sketch of a plant in ruins, with the subhead: "Remember Altoona Rayon?"

The gist of what remains to support this charge of threatening to move the plant is contained in the following quotation from Schwarzenbach's letter of March 9, 1967 to the employees:

> No matter what the TWUA may promise you, the Juniata record is a darn good one. Compare your wages, your holidays, your benefits, to industry figures, *to those in our own Front Royal mill for that matter!* Look at Juniata's 20-year record of around-the-clock employment. And the TWUA? *Why isn't there a single major textile operation left in the northeastern states?* Is that the kind of job security the union keeps talking about?
>
> Why is it that today virtually all our competition is located in the South?

Simple enough! The mills down there feel safe from the bickering, dissension and unreasonable demands that come with the TWUA. *Remember Altoona Rayon?*

> Virtually all of Stehli's fabric requirements now are being woven down south. These are fabrics which for many a year were mounted on Juniata looms. Those same southern mills are just waiting to supply Mr. Hommel with every yard of computer fabric he requires. *For Juniata there is no alternative but to again become competitive.* (Emphasis in original.)

It was stipulative that Altoona Rayon had closed its plant permanently in 1953 while under contract with the Textile Workers Union of America, the Union involved in this case.

There are *occasional* references in some of the group meetings to the possibility that the mill might be closed. The Trial Examiner reports an instance in which Taylor referred to the "New England" plant closing down because it could not compete, and Randy Thompson asked him point blank "if he was saying the Union caused them to close down," to which Taylor replied, "You said that, not us." In a similar incident employee Kintz testified that Elden replied, "I'm not allowed to say that." In another incident, employee Wilson testified that Rabenstein was worried because, if the Union got in, it could possibly mean his job and many others. We give these peripheral facts solely for the sake of completeness. The real thrust is in the speeches, the cartoon and the letter of March 9, 1967, supplemented by Schwarzenbach's letter of March 20, 1967, after the election, in which he stated, "what actually was at stake was the future of the mill and the long-term security of your job."

We thus approach the sensitive area of First Amendment rights of free speech where in a variety of contexts the Supreme Court has urged that these preferential rights be preserved. In particular we are to decide whether what was said and written on behalf of the

Company exceeded the bounds of lawful expression within the meaning of Section 8(c)[9] of the Act, which was a new provision and became part of the Taft-Hartley Act in 1947. We follow and reaffirm the rationale of N. L. R. B. v. Golub Corporation, 388 F.2d 921 (2d Cir. 1967), in which our Brother Friendly illuminated the text with a most helpful sketch of the historical background of Section 8(c).

Thus, the test is whether the fears expressed by Schwarzenbach were "shown to have so far transcended the bounds of reason as to justify the Board in finding them to be disguised threats of reprisal."

388 F.2d at page 929. Doubtless a good faith doubt or prediction "could so far outrun any possible basis for it" as to justify the Board in concluding that a threat was intended. 388 F.2d at page 928.

What was the crisis that impelled Schwarzenbach to write in his letter of March 9, 1967: "To say that I am concerned about the future of the mill is putting it mildly" ? The answer is to be found in the letter, which according to the teaching of *Golub*, and of common sense as well, must be taken in its entirety. Thus viewed, and we have reproduced the letter in the footnote,[10] the crisis was

---

9. Sec. 8(c) The expressing of any views, argument, or opinion, or the dissemination thereof, ·whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

10. (Letterhead of The Schwarzenbach Huber Co., 470 Park Avenue South, New York, N. Y. 10016)

March 9, 1967

Dear Employee:

The Juniata mill has been through a number of crises in its 54-year history. None, however, do I consider as serious as the one it faces right now. To say that I am concerned about the future of the mill is putting it mildly.

About three years ago, after more than a decade of progress and steady employment, performance at Juniata began to slip. To make matters worse, at about the same time our main product, off-loom acetate fabrics, began losing favor with the consumer. Our largest customer, Stehli, under severe competitive pressure, began checking around for another source of these fabrics. A year ago they discovered that a better quality piece of goods could be purchased, at a lower price, from that southern giant, J. P. Stevens. Since that day Stehli orders have been few and far between.

*Juniata, to survive, now required not only lower costs and fewer seconds, but a new product!* Fortunately, our typewriter and computer ribbon sales had been growing slowly but steadily. Here possibly was the product! Last spring it was decided to strip Front Royal of these constructions and concentrate all nylon weaving at Juniata. We believed a solution had been found, but alas our troubles had only begun!

Most of you will remember last summer's chaos at Juniata. Low efficiency, terrible quality, poor earnings, all of which led to astronomical financial losses to the company. Worst of all, we were no longer delivering goods to our customers.

In desperation, our Industrial Fabrics Division repeatedly requested permission to have their goods woven on the outside. My answer this time was no for I knew that once these fabrics were handed over to a southern mill they would never again be woven at Juniata. *Without this work the mill was dead!*

Just when things look blackest, efficiency and quality started to pick up. By the end of the year the mill was back under reasonable control and all of us in New York heaved a sigh of relief. Though costs were still a long way from what they will have to be, and seconds still a burden, we were back in business and once again shipping goods to our customers. Many of us believed that enough time had been gained in which to buckle down and improve overall mill performance.

This was not to be. A group of hotheads among you has now decided to exploit a situation which for over a year has been highly explosive. This

an economic one. The mill had been through a number of such crises in its 54-year history. The mill had been losing money, and Schwarzenbach gives chapter and verse, mentioning details that no man in his senses would have dared to state if they were fabrications, as the employees knew these facts as well as he did. Was it mere fiction that virtually all the Company's competitors had moved South, and that the Altoona Rayon mill had followed their example? The employees knew better than that; and it is also a matter of general common knowledge. The employees knew, as does everybody else, that union demands often cause increased costs which render it difficult or impossible for management to continue operating an enterprise that is already losing money.

While Schwarzenbach's speeches were made extemporaneously and were not reported, they also must be taken as a whole, and there is no reason to doubt that the substance of the speeches is reflected in the contents of the letter of March 9, 1967.

group tells you that by joining the TWUA you will be getting better earnings, better working conditions, better benefits and, of course, job security!

With 20 years of this business and numerous union elections (3 of them right in Juniata) under my belt, I know all this to be empty promises. *It has long been Company policy to pay at Juniata as well or better than our competitors.* If a raise, additional benefits, pensions, or whatever are truly in the cards, then you will get them! For this you need no TWUA, no $60.00 a year deducted from your pay-check. What you will not get and what the TWUA cannot get for you are benefits that lead to excessive costs. *No company can survive selling its product at a loss*, and this is exactly what we have been doing these last 8 months.

No matter what the TWUA may promise you, the Juniata record is a darn good one. Compare your wages, your holidays, your benefits, to industry figures, *to those in our own Front Royal mill for that matter!* Look at Juniata's 20-year record of around-the-clock employment. And the TWUA? *Why isn't there a single major textile operation left in the northeastern states?* Is that the kind of job security the union keeps talking about?

Why is it that today virtually all our competition is located in the South? Simple enough! The mills down there feel safe from the bickering, dissension and unreasonable demands that come with the TWUA. *Remember Altoona Rayon?*

Virtually all of the Stehli's fabric requirements now are being woven down south. These are fabrics which for many a year were mounted on Juniata looms. Those same southern mills are just waiting to supply Mr. Hommel with every yard of computer fabric he requires. *For Juniata there is no alternative but to again become competitive.*

Not too long ago this very mill of ours was probably the finest filament mill in the country. Of late, it has been having more than its share of troubles. In the hope of finding solutions, many a change has been made. Occasionally this may have led to some dissension and misunderstanding between us. But let us not be discouraged! Like you, management seeks nothing other than a better, more competitive mill which can then again offer *true* job security to you all. This is the way to achieve better wages and benefits for all.

Many of you have known me for a long time. I have always been partial to this Juniata mill. I have never wilfully misled you. I am convinced that the Company record justifies your confidence. Now, as in the past, I firmly believe you have *absolutely nothing to gain* by voting in the union.

Be Sure To Vote, But Let It Be A
Resounding "No" On March 16th.

Sincerely,

THE SCHWARZENBACH HUBER COMPANY

/s/ ROBERT M. SCHWARZENBACH

Robert M. Schwarzenbach
President

RMS:MM

(Emphasis in original.)

The Company had taken care to avoid a single statement by anyone connected with management that the Altoona Rayon plant was forced by the Union to go South. That is the significance ᵛof Elden's response to a question at one of the group meetings: "I'm not allowed to say that." In fact, the stipulation shows that this very Union, The Textile Workers of America, had a contract with Altoona Rayon for seven years before it moved in 1953. Certainly that plant could not have closed its doors as a reprisal against unionization.

 We have studied this record, including all the exhibits, with the greatest care, and we find absolutely nothing to indicate antagonism or hostility toword this Union or any union. The most substantial of the findings of Unfair Labor Practices we have set aside. Of the two remaining findings of Unfair Labor Practices, that we will enforce, the first was the inconsequential Brown incident, to be described presently, and the other was the formation of the Committee, after the election and many months after the sending of the letter of March 9, 1967. And the Committee was voluntarily disbanded by the Company not long after it was established and commenced to function. Under all these circumstances, there is nothing to support an inference that the references to the possibility of moving South were intended to or in fact did constitute a threat to retaliate by closing the plant if the Union won the election. To paraphrase the statement in *Golub*, 388 F.2d at page 928, "The only fair reading is that the employer would take these steps solely from economic necessity and with regret."

Nor do we find anything to the contrary in N. L. R. B. v. Miller, 341 F.2d 870 (2d Cir. 1965). There this Court evidently thought the views expressed by the employer so far outran any possible basis for what was said as to justify the inference that a threat of reprisal was intended. This is not such a case. And we reaffirm the statement in *Golub*, 388 F.2d at page 928, that the principle of *Miller* as above stated "is a principle that must be kept within narrow limits."

We conclude that the references to the possibility of moving South in the Schwarzenbach speech and in the letter of March 9, 1967 and elsewhere did not constitute, within the meaning of Section 8(a) (1), and Section 8(c), a threat that the Company would retaliate by moving South if the Union won the election. We set aside the finding of the Board that these communications violated Section 8 (a) (1) and we refuse to enforce it.

### C

### *The Alleged Threat to Bargain From Scratch.*

 Employee Massini testified that Taylor told her that if the Union got in "The slate would be wiped clean. The Company would start bargaining from scratch with no paid holidays or vacations."

This is an isolated instance. It goes contrary to all the discussions that had been going on for weeks in the group meetings where the constant subject of the dialogue between Taylor and various employees related to the bargaining process whereby the Union if elected would or could meet the gripes of the employees.

The alleged interview was first with Grossman who at Massini's request asked Taylor to come down and they both talked to her. When her affidavit given to the Board was produced on cross-examination it appeared, so far as we can make out from the transcript, that Massini had attributed to Grossman what she testified was said by Taylor. When counsel for the Company offered the affidavit as impeachment, this was met by the objection, which is not intelligible to us, that such matters did not constitute "contradictions," and the affidavit was not admitted. Both Grossman and Tay-

lor denied making any statement about "bargaining from scratch" but the Trial Examiner credited Massini's version. Nevertheless, it seems highly improbable that Taylor would make such a statement.

We think, in the context of the entire testimony, that in this instance also the Trial Examiner reached an erroneous conclusion. We set aside and refuse to enforce this finding of Section 8(a) (1) violation as not supported by substantial evidence on the record as a whole.[11]

### D

#### The Conversation Between Lewis and Bradley About Bumping.

■ Just about scraping the bottom of the barrel the Trial Examiner charges as a separate violation of Section 8(a) (1) a conversation between supervisor Lewis and employee Bradley. These two were old and constant, intimate friends. Each was the best man at the other's wedding. All this conversation amounts to is that Lewis, in the conversation with Bradley, referred to some of the group sessions in which some of the employees got the impression, or it was rumored that "there was going to be bumping in every department on the floor and also, there was going to be several bosses replaced." As he knew Bradley was strong for the Union and he suspected Bradley would be President of the Union if the Union won the election, Lewis asked Bradley if there was any truth in these rumors. Bradley replied: "I attended all the union meetings and not once did I hear any mention of any bosses being replaced." Bradley also told Lewis that he had no intention of being President of the Union.

How this disposition of an idle rumor running around the plant can be inflated into an Unfair Labor Practice is beyond our comprehension. We set aside this finding of violation of Section 8(a) (1)

and refuse to enforce it. This is included in the general catch-all of Conclusion 7 of the Trial Examiner's decision, adopted by the Board. The various findings of Unfair Labor Practices in violation of Section 8(a) (1) are so scrambled and fragmented in the decision of the Trial Examiner that we may have missed one or two minor items, but we think not.

### E

#### The Reprimand Administered to Clyde Brown.

■ While the incident is not one of great consequence, we think the Company did discipline Brown for soliciting for the Union in the plant during working hours whereas it had previously followed a very liberal policy of permitting, at least on one occasion, solicitation for other than union purposes during working hours. We sustain this finding of violation of Section 8(a) (1) and will enforce it, as modified by the Board. This is the only one of the alleged violations of Section 8(a) (1) summarized in Conclusion 7 of the Trial Examiner and adopted and modified by the Board that we sustain and will enforce.

### F

#### The Employee Committee.

■ After the election the Company thought it was a good idea to form an Employee Committee with rotating groups of employees to bring complaints of the employees to the attention of management and assist in a proper, just and equitable processing of these complaints. The Company chose the employees who were to serve on the Committee, paid them for the time they spent on the business of the Committee and controlled the whole affair. This was a clear violation of Section 8(a) (2). There is no doubt that the Committee was a Labor Organization as defined in the Act. We

---

11. And see Bauer Welding & Metal Fabricators, Inc. v. N. L. R. B., 358 F.2d 766 (8th Cir. 1966) ; Surprenant Mfg. Co. v. N. L. R. B., 341 F.2d 756 (6th Cir. 1965) ; Hendrix Mfg. Co. v. N. L. R. B., 321 F.2d 100 (5th Cir. 1963). See also Irving Air Chute Co. v. N. L. R. B., 350 F.2d 176 (2d Cir. 1965).

sustain this finding of the Board and will enforce it, despite the fact that the Company voluntarily disbanded this Committee on July 27, 1967. This is Conclusion 6 of the Trial Examiner, adopted by the Board.

We permit the order setting aside the election to stand, not for the reasons given by the Board, but because we think it is better for all concerned to have a new election, if either the Union or the Company so desires.

# APPENDIX

The "Representation" Cards
Reproduction of the Front and Back of Card No. 1

## (Front)

*LANGENBACKER* 426 FORM 42

**TEXTILE WORKERS UNION OF AMERICA**
*Affiliate of the AFL-CIO and CLC*
(DATE) ____/- ᒪ ᑡ__196_7_

I hereby accept membership in the Textile Workers Union of America of my own free will and do hereby designate said Textile Workers Union of America as my representative for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment.

MILL _____

DEPARTMENT _____ SHIFT __3__

NAME _____ (DO NOT PRINT)

ST. AND NO. _____

CITY _____

(RECEIVED BY) HOME PHONE NO. _____

## (Back)

RECEIVED JAN 29 1967

Summary of Data Contained on Front and Back of
Cards Nos. 1-122 Inclusive

Card No. 1:
 <u>front</u>

David Langenbacker 1-29 1967

received by CEF.

 <u>back</u>

GCX # 20-1 received Jan 29 1967 signed @ meeting CEF

Board Stamp 10:15 Feb 13 1967

Card No. 2:
 <u>front</u>

Anthony R. Salome 1/29/67

received by CEF.

 <u>back</u>

GCX # 20-2 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 3:
 <u>front</u>

Joyce Jewell 1/29 1967

received by CEF.

 <u>back</u>

GCX # 20-3 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb. 13 1967

Card No. 4:
 <u>front</u>

Melvin L. Wyland Jan 29 1967

received by ---

 <u>back</u>

GCX # 20-4 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13, 1967

Card No. 5:
 <u>front</u>

Richard Wiley Jan 29 1967

received by ---

 <u>back</u>

GCX # 20-5 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 6:
 <u>front</u>

 Naomi Wasmeier 1/ 29 1967

 received by CEF.

 <u>back</u>

 GCX # 20-6 received Jan 29 1967 signed @ meeting CEF,

 Board Stamp 10:15 Feb 13 1967

Card No. 7:
 <u>front</u>

 Robert D. Walters 1-29 1967

 received by ---

 <u>back</u>

 GCX # 20-7 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 8:
 <u>front</u>

 William W Wilson 1/29 1967

 received by ---

 <u>back</u>

 GCX # 20-8 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967.

Card No. 9:
 <u>front</u>

 Jessie Walters 1-29 1967

 received by CEF,

 <u>back</u>

 GCX # 20-9 received Jan 29 1967 signed @ meeting CEF,

 Board Stamp 10:15 Feb 13 1967

Card No. 10:
 <u>front</u>

 Randolph L. Thompson 1-29 1967

 received by CEF,

 <u>back</u>

 GCX # 20-10 received Jan 29 1967 signed @ meeting ---

 Board Stamp 10:15 Feb 13 1967

Card No. 11:

 <u>front</u>

 William Slone 1/28/ 1967

 received by CEF.

 <u>back</u>

 GCX # 20-11 received Jan 29 1967 **signed @ meeting CEF.**

 Board Stamp 10:15 Feb 13 1967

Card No. 12:

 <u>front</u>

 Joseph R. Stacey 1/29/ 1967

 received by CEF.

 <u>back</u>

 GCX # 20-12 received Jan 29 1967 **signed @ meeting CEF.**

 Board Stamp 10:15 Feb 13 1967

Card No. 13:

 <u>front</u>

 Fannie E. Ryan 1-29 1967

 received by CEF,

 <u>back</u>

 GCX # 20-13 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 14:

 <u>front</u>

 Paul J Pruznak Jr. 1/28/67

 received by CEF.

 <u>back</u>

 GCX # 20-14 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 15:

 <u>front</u>

 Melvin Mueller 1/29/66

 received by CEF.

 <u>back</u>

 GCX # 20-15 received Jan 29 1967 signed @ meeting CEF

 Board Stamp 10:15 Feb 13 1967

Card No. 16:
 <u>front</u>

 William Mayernick 1-29 1967

 received by CEF.

 <u>back</u>

 GCX # 20-16 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 17:
 <u>front</u>

 Harry Frank McGraw Jan 29 1967

 received by CEF.

 <u>back</u>

 GCX # 20-17 received Jan 29 1967 signed at meeting. CEF,

 Board Stamp 10:15 Feb 13 1967

Card No. 18:
 <u>front</u>

 John A. Diehl 1-29- 1967

 received by CEF.

 <u>back</u>

 GCX # 20-18 received Jan 29 1967 signed @ meeting CEF,

 Board Stamp 10:15 Feb 13 1967

Card No. 19:
 <u>front</u>

 Walter J. Delozier Jr 1-29 1967

 received by CEF,

 <u>back</u>

 GCX # 20-19 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 20:
 <u>front</u>

 James Edelblute Jan 29 1967

 received by CEF.

 <u>back</u>

 GCX # 20-20 received Jan 29 1967 signed @ meeting CEF,

 Board Stamp 10:15 Feb 13 1967

Card No. 21:

<u>front</u>

Betty Elders 1/29/ 1967

received by CEF.

<u>back</u>

GCX # 20-21 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb. 13 1967

Card No. 22:

<u>front</u>

Paul J. Gardner 1-29 1967

received by CEF.

<u>back</u>

GCX # 20-22 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 23:

<u>front</u>

Raymond R. Guella 1-29 1967

received by ---

<u>back</u>

GCX # 20-23 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 24:

<u>front</u>

Edgar L Langenbacker Jr 1-29 1967

received by CEF.

<u>back</u>

GCX # 20-24 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 25:

<u>front</u>

Warren E Lantz 1-29- 1967

received by CEF.

<u>back</u>

GCX # 20-25 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 26:
### front
Gerald D. Luther Jr Jan. 29 1967

received by CEF.
### back
GCX # 20-26 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 27:
### front
Darel E. Aller 1-29 1967

received by ---
### back
GCX # 20-27 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 28:
### front
Edward A. Arthurs Jan 29 1967

received by CEF.
### back
GCX # 20-28 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 29:
### front
John C Bauer Jan 29 1967

received by CEF.
### back
GCX # 20-29 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 30:
### front
Ronald W. Bender Jan. 29 1967

received by CEF.
### back
GCX # 20-30 received Jan 29 1967 signed @ meeting CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 31:
 front

 Lester Bennett 1-29 1967

 received by ---
 back

 GCX # 20-31 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 32:
 front

 Jonas Corbin Jr. Jan 29 1966

 received by CEF.
 back

 GCX # 20-32 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 33:
 front

 Clyde L. Brown 1-29 1967

 received by ---
 back

 GCX # 20-33 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 34:
 front

 Donald P. Bradley 1-29 1967

 received by CFF.
 back

 GCX # 20-34 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 35:
 front

 Ronald E Brackbill Jan 29 1967

 received by CEF.
 back

 GCX # 20-35 received Jan 29 1967 signed @ meeting CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 36:
 <u>front</u>

 Francis Taddy January 30 1967

 received by ---

 <u>back</u>

 GCX # 20-36 received Feb 1 1967 Left @ Hotel Desk CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 37:
 <u>front</u>

 Kenneth Delozier January 31 1967

 received by Committee

 <u>back</u>

 GCX # 20-37 . received Feb 1 1967 Left at Hotel desk CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 38:
 <u>front</u>

 Donald Dambeck 1-29 1967

 received by Committee

 <u>back</u>

 GCX # 20-38 received Jan 30 1967 at Plant From R.
 Thompson CEF.
 Board Stamp 10:15 Feb 13 1967

Card No. 39:
 <u>front</u>

 Arthur Jock 31 Jan. 1967

 received by Left @ Hotel Desk

 <u>back</u>

 GCX # 20-39 received Feb 1 1967 Left @ Hotel Desk CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 40:
 <u>front</u>

 Louis Delozier 1-29-67

 received by Committee

 <u>back</u>

 GCX 20-40 received Jan 30 1967 At plant gate From
 R. Thompson CEF.
 Board Stamp 10:15 Feb 13 1967

Card No. 41:
 <u>front</u>

John H. Hamel 1/30 1967

received by Committee

 <u>back</u>

GCX 20-41 received Jan 30 1967 At Plant Gate From
 R. Thompson CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 42:
 <u>front</u>

Melvin E. Kintz, Jr. January 30 1967

received by ---

 <u>back</u>

GCX 20-42 received Jan 30 1967 From R. Thompson CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 43:
 <u>front</u>

Richard Killinger Feb. 1 1967

received by R.T. CEF.

 <u>back</u>

GCX 20-43 received Feb 1 1967 @ Plant Gate CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 44:
 <u>front</u>

' Clinton E. Lane 1-31 1967

received by Committee

 <u>back</u>

GCX 20-44 received Jan 30 1967 At plant gate From
 R. Thompson CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 45:
 <u>front</u>

Stephen J Lockard Jan 30 1967

received by Committee

 <u>back</u>

GCX 20-45 received Jan 30 1967 At plant gate From
 R. Thompson CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 46:
 front

 Mary Ann DeBartolome 2-3 1967

 received by ---

 back

 GCX 20-46 received Feb 3 1967 Randy Thompson CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 47:
 front

 Edna Cooper Jan 29 1967

 received by Committee

 back

 GCX 20-47 received Jan 30 1967 At plant gate From R. Thompson CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 48:
 front

 Wilbur J Gensamer 2-1 1967

 received by ---

 back

 GCX 20-48 received Feb 3 1967 Randy Thompson CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 49:
 front

 Jerry D. Gensamer 1/30 1967

 received by ---

 back

 GCX 20-49 received Feb 3 1967 From Randy Thompson CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 50:
 front

 Mary J. Dickman Jan 30 1967

 received by ---

 back

 GCX 20-50 received Feb 1 1967 Left @ Hotel Desk CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 51:

 <u>front</u>

Richard E. Coley Jr January 30 1967

received by Committee

 <u>back</u>

GCX 20-51 received Jan 30 1967 At plant gate from
R. Thompson CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 52:

 <u>front</u>

April Fahr January 29 1967

received by Committee

 <u>back</u>

GCX 20-52 received Jan 30 1967 At plant gate From
R. Thompson CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 53:

 <u>front</u> <u>1</u>

Miss Ruth Fisher 7-31 1967

received by ---

 <u>back</u>

GCX 20-53 received Feb 1 1967 Left at Hotel Desk
CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 54:

 <u>front</u>

Ray. T. Ecker Ray T. Ecker 1-29- 1967

received by Committee

 <u>back</u>

GCX 20-54 received Feb 2 1967 From A. Salome at
Hotel CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 55:

 <u>front</u>

Fred Fornwalt 2-2 1967

received by Committee

 <u>back</u>

GCX 20-55 received Feb 2 1967 Rec'd from A. Salome
at Hotel CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 56:

 **front**

 Mary C. McCartney 2/1/ 1967

 received by Committee

 **back**

 GCX 20-56 received Feb 2 1967 Rec'd from A. Salome at Hotel CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 57:

 **front**

 Richard E. Brooks Feb 1, 196' 1967

 received by Committee

 **back**

 GCX 20-57 received Feb 2 1967 Rec'd from A. Salome at Hotel CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 58:

 **front**

 Janet R. Gibbons 1/30 1967

 received by JJM

 **back**

 GCX 20-58 received Jan 31 1967 From Myers
 ~~R. Thompson~~ CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 59:

 **front**

 Walter Lindemer 2/3 1967

 received by Edleblute

 **back**

 GCX 20-59 received Feb 5 1967 From J. Edleblute CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 60:

 **front**

 Feb.
 Mary Lou Davinsizer Jan. 6 1967

 received by C. Brown CEF.

 **back**

 GCX 20-60 ------ Rec'd from C. Brown at Plant gate Feb. 6,

 Board Stamp 10:15 Feb 13 1967 1967 CEF.

Card No. 61:
 front
 Jean M. Bittwy Jan 31 1967
 received by mail CEF.
 back
 GCX 20-61 received Feb 1 1967 By mail CEF.
 Board Stamp 10:15 Feb 13 1967

Card No. 62:
 front
 Rody Ecker Feb. 1 1967
 received by ---
 back
 GCX 20-62 received Feb 1 1967 @ Plant Gate CEF.
 Board Stamp 10:15 Feb 13 1967

Card No. 63:
 front
 Lilia Diehl Jan 30 1967
 received by Diehl CEF.
 back
 GCX 20-63 received Feb 1 1967 @ Plant Gate CEF.
 Board Stamp 10:15 Feb 13 1967

Card No. 64:
 front
 William L Corl 30 Jan 1967
 received by CEF. @ Plant Gate 2/1/67
 back
 GCX 20-64 received Feb 1 1967 @ Plant Gate CEF.
 Board Stamp 10:15 Feb 13 1967

Card No. 65:
 front
 James E. Lear 2/1 1967
 received by ---
 back
 GCX 20-65 received Feb 1 1967 At Plant Gate CEF.
 Board Stamp 10:15 Feb 13 1967

Card No. 66:
<u>front</u>

George R Kauffman 1/30/ 1967
George R. Kauffman (typed)
received by ---

<u>back</u>

GCX 20-66 received Feb 1 1967 Plant Gate CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 67:
<u>front</u>

Wilbur K. Henry Jan 30 1967

received by ---

<u>back</u>

GCX 20-67 received Feb 1 1967 @ Plant Gate CEF.

Board Stamp 10:15 Feb 13 ·1967

Card No. 68:
<u>front</u>

R. Gardner Jr. 1-30-67 1967

received by Wilson CEF.

<u>back</u>

GCX 20-68 received Feb 1 1967 @ Plant Gate CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 69:
<u>front</u>

Jerome Green 2-1 1967

received by Committee

<u>back</u>

GCX 20-69 received Feb 1 1967 @ Plant Gate CEF.

Board Stamp 10:15 Feb 13 1967

Card No. 70:
<u>front</u>

Robert D Zeak 1/30 1967

received by Committee

<u>back</u>

GCX 20-70 received Jan 30 1967 At Plant Gate From
 R. Thompson CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 71:
<u>front</u>

Daniel H. Wilt January 30 1967

received by ---

<u>back</u>

GCX 20-71 received Jan 31 1967 Rec'd from R.
Thompson CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 72:
<u>front</u>

Robert H. Weaver Jan 30 1967

received by Committee

<u>back</u>

GCX 20-72 received Jan 30 1967 At Plant Gate From R.
Thompson CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 73:
<u>front</u>

Carl Wasmeier 1/29/67 1967

received by Committee

<u>back</u>

GCX 20-73 received Jan 30 1967 At plant gate From
R. Thompson CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 74:
<u>front</u>

Mildred Smith Jan 29 1967

received by Committee

<u>back</u>

GCX 20-74 received Jan 30 1967 At plant gate From
R. Thompson CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 75:
<u>front</u>

Gerald K. Settle Jan. 30, 1967

received by ---

<u>back</u>

GCX 20-75 received Jan 31 1967 Rec'd from R. Thompson
CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 76:
 <u>front</u>

 James C. Russ Jan. 30 th 1967

 received by Committee

 <u>back</u>

 GCX 20-76 received Jan 30 1967 At Plant gate From
 R. Thompson CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 77:
 <u>front</u>

 Archie Prosperi` 1/30 1967

 received by Committee

 <u>back</u>

 GCX 20-77 received Jan 31 1967 Rec'd from R. Thompson
 Board Stamp 10:15 Feb 13 1967 CEF.

Card No. 78:
 <u>front</u>

 William Nolan Jan 29 1967

 received by Committee

 <u>back</u>

 GCX 20-78 received Jan 30 1967 . At Plant gate From
 Board Stamp 10:15 Feb 13 1967 R. Thompson CEF.

Card No. 79:
 <u>front</u>

 Thelma Nolan Jan 29 1967

 received by Committee

 <u>back</u>

 GCX 20-79 received Jan 30 1967 At plant gate from
 Board Stamp 10:15 Feb 13 1967 R. Thompson CEF.

Card No. 80:
 <u>front</u>

 Joseph Mueller 1/29 1967

 received by RT

 <u>back</u>

 GCX 20-80 received Feb 3 1967 From Randy Thompson
 Board Stamp 10:15 Feb 13 1967 CEF

Card No. 81:
 front
 Rudolph J. Mueller 1-31 1967
 received by Committee
 back
 GCX 20-81 received Jan 31 1967 From R. Thompson CEF
 Board Stamp 10:15 Feb 13 1967

Card No. 82:
 front
 Judy Massini 1/30 1967
 received by ---
 back
 GCX 20-82 received Jan 31 1967 Rec'd from R. Thompson
 Board Stamp 10:15 Feb 13 1967 CEF.

Card No. 83:
 front
 Joan McIntire 1/29 1967
 received by Committee
 back
 GCX 20-83 received Jan 30 1967 At plant gate From
 Board Stamp 10:15 Feb 13 1967 R. Thompson CEF.

Card No. 84:
 front
 Raynor G. McGinnis 1/30 1967
 received by RT
 back
 GCX 20-84 received Feb 3 1967 From Randy Thompson
 Board Stamp 10:15 Feb 13 1967 CEF.

Card No. 85:
 front
 Nancy L Wise 2/6 1967
 received by James Edleblute
 back
 GCX 20-85 received Feb 6 1967 11:05 p From James
 Board Stamp 10:15 Feb 13 1967 Edleblute @ Plant
 Gate CEF.

Card No. 86:
### front
Robert W. Singer 2-6 1967

received by J. Edleblute CEF.

### back
GCX 20-86 received Feb 6 1967 11o5 pm From James
 Edleblute at Plant
Board Stamp 10:15 Feb 13 1967 Gate CEF.

Card No. 87:
### front
Ted Mastos 2-6 1967

received by James Edleblute CEF.

### back
GCX 20-87 received Feb 6 1967 11o5 P. From James
 Edleblute @ Plant
Board Stamp 10:15 Feb 13 1967 Gate CEF.

Card No. 88:
### front
Howard C. Shawley Sr. Feb, 1 1967

received by Committee

### back
GCX 20-88 received Feb 2 1967 From A. Salome at
 Hotel CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 89:
### front
Clair W. Marshman 1-30- 1967

received by A. Salome CF

### back
GCX 20-89 received Feb 2 1967 From A. Salome at
 Hotel CEF.
Board Stamp 10:15 Feb.13 1967

Card No. 90:
### front
Melvin McIntire 1-31- Ø 1967

received by ---

### back
GCX 20-90 received Feb 1 1967 Left @ Hotel Desk
 CEF.
Board Stamp 10:15 Feb 13 1967

Card No. 91:

 <u>front</u>

 R.L. Wakefield 2/2/ 1967

 received by CB

 <u>back</u>

 GCX 20-91 received Feb 3 1967 Clarence Brown CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 92

 <u>front</u>

 Ronald Taddy 1-31 1967

 received by JJM

 <u>back</u>

 GCX 20-92 received Jan 31 1967 From Myers CEF.

 Board Stamp 10:15 Feb 13 1967

 Union Stamp: Textile Workers Union of America, A.F.OF L.-C.I.O.
 1304 High Street Pottstown, Pennsylvania

Card No. 93:

 <u>front</u>

 Donna Markel January 30 1967

 received by JJM

 <u>back</u>

 GCX 20-93 received Jan 31 1967 Myers CEF.

 Board Stamp 10:15 Feb 13 1967

 Union Stamp: Textile Workers Union of America, A.F.OF L.- C.I.O.
 1304 High Street Pottstown, Pennsylvania

Card No. 94:

 <u>front</u>

 Margaret Smouse Jan 30 1967

 received by mail CEF.

 <u>back</u>

 GCX 20-94 received Feb 1 1967 By mail CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 95:

 <u>front</u>

 John Mittermeier 2/1/67

 received by ---

 <u>back</u>

 GCX 20-95 received Feb 1 1967 @ Plant Gate CEF.

 Board Stamp 10:15 Feb 13 1967

Card No. 96:
 <u>front</u>

 Helen McKendree 2 ------ 1967
 received by at Plant Gate CEF 2/10/67
 <u>back</u>
 GCX 20-96 ------ --------
 Board Stamp 10:15 Feb 13 1967

Card No. 97:
 <u>front</u>
 Patrick G. O'Hara Jan 31 1967
 received by R. Guella J.E.
 <u>back</u>
 GCX 20-97 ------ ------- --------
 Board Stamp 10:15 Feb 13 1967

Card No. 98:
 <u>front</u>
 Margaret A. Van Tries 2/1 1967
 received by CEF. at Plant Gate 2/2/67
 <u>back</u>
 GCX 20-98 received Feb 2 1967 at Plant Gate CEF.
 Board Stamp 10:15 Feb 13 1967

Card No. 99:
 <u>front</u>
 William F Yingling Jr 2-9 1967
 received by C Brown J.E. 2-9-67
 <u>back</u>
 GCX 20-99 ----- -------
 Board Stamp 10:15 Feb 13 1967

Card No. 100:
 <u>front</u>
 Maury L. Delozier Feb. 13 1967
 received by J.E.
 <u>back</u>
 GCX 20-100 received Feb 21 1967 From J. Meyers CEF.
 Board Stamp 1967 Mar 2 am 9:40

Card No. 101:

 front

 John Bianconi 2/14/67

 received by JJM

 back

 GCX 20-101 ------ Rec'd from J. Meyers
 2/14/67 CEF.
 Board Stamp 1967 Mar 2 am 9:40

Card No. 102:

 front

 Calsie D. Gearhart 2-11 1967

 received by JJM

 back

 GCX 20-102 ------ . Rec'd 2-13-67
 From JJM CEF.
 Board Stamp 1967 Mar 2 am 9:40

Card No. 103:

 front

 Gordon Runk Feb 17, 1967

 received by J.M CEF.

 back

 GCX 20-103 ------ . Rec'd from J. Meyers
 2/19/67 CEF.
 Board Stamp 1967 Mar 2 am 9:40

Card No. 104:

 front

 Jay Nedimyer 2/21/ 1967

 received by JE

 back

 GCX 20-104 received Feb 21 1967 From J. Meyers CEF.

 Board Stamp 1967 Mar 2 am 9:40

Card No. 105:

 front

 William R. Potter Febr. 21 1967

 received by J.E.

 back

 GCX 20-105 received Feb 21 1967 From J. Meyers CEF.

 Board Stamp 1967 Mar 2 am 9:40

Card No. 106:
> ### front
> Harry Lynn Walters 2/21 1967
>
> received by JE
>
> ### back
> GCX 20-106 received Feb 21 1967 From J. Meyers CEF.
>
> Board Stamp 1967 Mar 2 am 9:40

Card No. 107:
> ### front
> Judy Walters 2/21 1967
>
> received by JE
>
> ### back
> GCX 20-107 received Feb 21 1967 From J. Meyers CEF.
>
> Board Stamp 1967 Mar 2 am 9:40

Card No. 108:
> ### front
> Mary Workinger February 21 1967
>
> received by JE
>
> ### back
> GCX 20-108 received Feb 21 1967 From J. Meyers CEF.
>
> Board Stamp 1967 Mar 2 am 9:40

Card No. 109:
> ### front
> Harold Taddy 2-20 1967
>
> received by CB.
>
> ### back
> GCX 20-109 ------ Rec'd of James Myers
> 2/23/67 CEF.
> Board Stamp 1967 Mar 2 am 9:40

Card No. 110:
> ### front
> Francis Long 2-20 1967
>
> received by C.B.
>
> ### back
> GCX 20-110 ------ Rec'd of James Myers
> 2/23/67 CEF.
> Board Stamp 1967 Mar 2 am 9:40

Card No. 111:

 <u>front</u>

 John Hillard 2/16/ 1967

 received by @ Plant Gate From CB

 <u>back</u>

 GCX 20-111 ------ Rec'd 2/16/67 From
 Clyde Brown @ Plant
 Board Stamp 1967 Mar 2 am 9:40 Gate CEF.

Card No. 112:

 <u>front</u>

 Richard O. Hamp Feb. 20 1967

 received by P.P. JJM

 <u>back</u>

 GCX 20-112 ------ Rec'd from J. Meyers
 2/22/67 CEF.
 Board Stamp 1967 Mar 2 am 9:40

Card No. 113:

 <u>front</u>

 Robert J. Hamp Feb. 20, 1967

 received by Wilson WW CEF.

 <u>back</u>

 GCX 20-113 ------ Rec'd from W. Wilson
 2/24/67 CEF.
 Board Stamp 1967 Mar 2 am 9:40

Card No. 114:

 <u>front</u>

 Benedict Hebler 2/19 1967

 received by P.P. JJM

 <u>back</u>

 GCX 20-114 ------ Rec'd from J. Meyers
 2/22/67 CEF.
 Board Stamp 1967 Mar 2 am 9:40

Card No. 115:

 <u>front</u>

 Nick Colella 2/6 1967

 received by J. Corbin Jr. CEF.

 <u>back</u>

 GCX 20-115 ------ Rec'd at meeting
 2/26/67 CEF.
 Board Stamp 1967 Mar 2 am 9:40

Card No. 116:
 <u>front</u>

 Annette Steinbugl February 20 1967

 received by Paul Gardner CEF.

 <u>back</u>

 GCX 20-116 ------ Rec'd @ meeting
 2/26/67 CEF.
 Board Stamp 1967 Mar 2 am 9:40

Card No. 117:
 <u>front</u>

 Clarence M. Aikens Mar. 6 1967

 received by mail CEF.

 <u>back</u>

 GCX 20-117 received Mar 6 1967 By mail CEF.

 Board Stamp 1967 Mar 13 am 9:07

Card No. 118:
 <u>front</u>

 Charles L. Brown 3/6 1967

 received by mail CEF.

 <u>back</u>

 GCX 20-118 received Mar 6 1967 By mail CEF.

 Board Stamp 1967 Mar 13 am 9:07

Card No. 119:
 <u>front</u>

 Howard D. Mentzer Feb. 25 1967

 received by C.B. CEF.

 <u>back</u>

 GCX 20-119 ------ Rec'd from Clyde
 Brown at meeting
 Board Stamp 1967 Mar 13 am 9:06 3/8/67 CEF.

Card No. 120:
 <u>front</u>

 Leonard Wilson Feb 24 1967

 received by R.t.

 <u>back</u>

 GCX 20-120 ------ Rec'd from Randy
 Thompson 3/1/67 CEF.
 Board Stamp 1967 Mar 13 am 9:06

Card No. 121:

<u>front</u>

Gerald S. Boonie 3-2 1967

received by JJ Sanello

<u>back</u>

GCX 20-121 ------ Rec d 3/2/67
J Cline myer CEF.
Board Stamp 1967 Mar 13 am 9:07

Card No. 122:

<u>front</u>

Donalrd R. Figliola Feb. 27 1967

received by JE. JJM.

<u>back</u>

GCX 20-122 ------ Rec'd from James
Meyers 2/28/67 CEF.
Board Stamp 1967 Mar 13 am 9:06