**Sandra WETZEL and Mari Ross on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, a corporation, Defendant.**

**Civ. A. No. 72–169.**

United States District Court,
W. D. Pennsylvania.

Jan. 9, 1974.

On Motion to Reconsider Feb. 20, 1974.

Robert F. Stone, Howard A. Specter, Litman, Litman, Harris & Specter, Pittsburgh, Pa., for plaintiffs.

Kalvin M. Grove, Lederer, Fox & Grove, Chicago, Ill., Robert A. Penney, Boston, Mass., Clem R. Kyle, Pittsburgh, Pa., for defendant.

Milton A. Smith, Gen. Counsel, Richard B. Berman, Chamber of Commerce of the U. S., Washington, D. C., George Smetana, Laurence D. Ehrlich, Julian D. Schrieber, Chicago, Ill., Walter P. De-Forest, III, Pittsburgh, Pa., amicus curiae for defendants.

Beth L. Don, EEOC, Washington, D. C., James F. Bennett, EEOC, Pittsburgh, Pa., amicus curiae for plaintiffs.

## OPINION

WEBER, District Judge.

The two named Plaintiffs on behalf of themselves and all other female technical employees employed in Defendant Liberty Mutual Insurance Company's Claims Department (the Company) have filed a Complaint charging that the Company discriminated against women in hiring, job classification, promotions, and in

the compensation and job benefits they received for the jobs they were allowed to hold.

The Representative Plaintiffs are Sandra Wetzel, a woman, who was hired by Defendant Company as a "Claims Representative" in July 1967, and Mari Ross, who was hired by Defendant Company as a "Claims Representative" in September 1967. Both allege that they suffered discrimination by reason of their sex because of the hiring, job classification, pay differential, and employment benefit policies of Defendant Company and that these policies were applied to all female technical employees in the Defendant's Claims Department throughout the nation where Defendant Company did business.

The court determined that the action should proceed as a class action covering all female technical employees in the Defendant's Claims Department in the entire geographical area where the Company did business. The class as now defined includes all such employees who were hired or working for the Company in its Claims Department since July 2, 1965, the effective date of Title VII of 42 U.S.C. § 2000e et seq., the Equal Employment Opportunity Act of 1972.

Extensive discovery has been employed and the Plaintiffs now file a motion for partial summary judgment on certain of the issues raised. It is agreed between the parties that one of the issues, designated the "equal pay" issue, is not susceptible of summary judgment at this time because there are disputed issues of fact with respect to whether or not the work performed by women in the job classification of "Claims Representative" was equal to the work performed by men in the job classification of "Claims Adjuster" for which they were paid a substantially higher salary. However, the Plaintiffs at this time allege that there is no genuine issue as to any material fact with respect to the job classification under which men and women were originally hired as technical employees in the Claims Department, with regard to the promotional policy within the Claims Department, and with regard to the pregnancy and maternity leave policies of the Company including the disability income protection plan of the Company as applied to women on maternity leave.

The key point of discrimination set forth in the pleadings, evidentiary material and briefs of the plaintiffs, and the *amicus curiae* brief of the United States Equal Employment Opportunity Commission is the hiring policy of the Company, since original assignment in effect determines the employee's future chances of promotion within the Company. Because the Company in its Claims Department promotes from its own ranks, the opportunity for advancement depends upon the entry level position to which an employee is assigned upon first being employed by the Company's claim division. Promotion to the higher rank of Claims Supervisor was limited to persons holding the position of Claims Adjuster and throughout most of the period under consideration through 1970 was limited to male employees because all Claims Adjusters were male. On the other hand the entry level classification in the Company's Claims Department of "Claims Representative" was exclusively limited to women throughout most of the period under consideration here. There was no avenue of promotion to Claims Supervisor and higher supervisory positions from those personnel classified as "Claims Representatives" on entry into the Company in its Claims Division.

There were two higher supervisory positions in the "Claims Representative" category, that of "Supervising Claims Representative" and "Claims Representative Supervisor", but no promotion beyond the second rank. Although the line of responsibility from "Claims Representative Supervisor" runs to "Claims Supervisor" there is no similar line of promotion because all "Claims Supervi-

sors" are drawn from the ranks of "Claims Adjuster".

The lines of responsibility and promotion are illustrated as follows:

CLAIMS DEPARTMENT - TECHNICAL EMPLOYEES

LINES OF RESPONSIBILITY AND PROMOTION

lines of responsibility _____
lines of promotion -- -- -- --

---

The same educational requirements were in 1965 and thereafter until 1970 with respect to the hiring of "Claims Adjusters" and "Claims Representatives", a college degree. No prior experience in the insurance business was required and in fact the Company did not hire persons who had worked for other insurance companies in its entry level positions in the Claims Department.

Although the Defendant Company had employed "Claims Adjusters" for a long period of time the position of "Claims Representative" was created in mid-1965. The position was created when the Company had decided to handle more of its claims work from inside its offices. A recruiting brochure for this position was prepared and circulated through college placement offices and employment agencies. The qualification for the "Claims Representative" position included a college degree. The recruiting brochure is entirely female oriented. Its title page bears the caption and picture identifying the position as a job fit for a queen. It shows women in its illustrations of persons performing their duties in this capacity. Between July 1, 1965 and the end of 1966, 401 persons

were hired for the positions of "Claims Representative", not one of which was male. Between July 1, 1965 and March 17, 1972, 2,329 persons were hired as "Claims Representatives" of which 2,302 or 98.84% were women. The first male "Claims Representative" was hired in 1969, four in 1970, and twenty in 1971. During the period from 1965 until the end of 1970, the Company hired over 2,000 "Claims Adjusters", not one of which was female.

The recruiting brochure used by the Company during this period describing the position and duties of "Claims Adjusters" was entirely male oriented, its illustrations showing men performing the duties of the position, and bearing the legend in large type, "Are you the right man?", and reciting the avenues of advancement from Claims Adjuster through Branch Office Claims Manager, Division Claims Manager, Manager Home Office Examiners' Division, and so on up the ladder. The Company promoted to advanced positions in its Claims Department solely from those persons who had served it in the capacity of "Claims Adjuster".

The two Representative Plaintiffs were hired in the position of "Claims Representative" and they have deposed that in answer to their inquiries they were informed that the position of "Claims Adjuster", the beginning of the promotional ladder in the Claims Department, was not available for women. It has been admitted by representatives of the Defendant that the two named Representative Plaintiffs were qualified for the position of "Claims Adjuster" at the time of the original hiring.

It would serve little purpose to recite in detail the great mass of statistical evidence which the Plaintiffs have produced in support of their contention that the two initial entry positions were segregated between male and female applicants, that the educational requirement for both positions was the same, that no prior insurance experience was required for either position, that the functions performed in these positions were very similar, that the pay differential between the positions was substantial, being approximately $2,500 per year greater for the Claims Adjuster, that prior to 1971 no opportunity was given to women "Claims Representatives" to qualify for the position of "Claims Adjuster", and that all promotions to higher positions in the Claims Department were made from the ranks of the exclusively male "Claims Adjuster" classification.

In addition to the statistical evidence which is unrebutted here the Plaintiffs have produced additional supporting evidence of the Company's employment policies with respect to women in the Claims Division. Much of this evidence is in the form of oral testimony and affidavits which may be subject to a question of credibility but a good deal of the supporting evidence is documentary and supports the Plaintiffs' contention of a recognized pattern of treating the male and female employees in the Claims Department differently in respect to recruitment, hiring classifications, promotional opportunities, and salary.

We are not speaking of salary or compensation with respect to the question of whether equal pay was given for the same work but in connection with the entry level salary paid for the two classifications and the salary differential between "Claims Representatives" of considerable experience and the starting salary which they could receive when openings were finally made available to "Claims Representatives" to become "Claims Adjusters".

Two sections of Fed.R.Civ.P. 56 are applicable to our consideration of Plaintiffs' motion for summary judgment. Fed.R.Civ.P. 56(c) provides in part:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and [the] admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."

and Fed.R.Civ.P. 56(e) which provides in part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits, or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

■ The Plaintiffs have relied chiefly on statistical evidence in support of their contention of discriminatory employment policies and in many cases the courts have accepted such evidence in determination of whether Title VII has been violated. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 [8th Cir. 1970]; Witherspoon v. Mercury Freight Lines, Inc., 457 F.2d 496 [5th Cir. 1972]; Bing v. Roadway Express, Inc., 444 F.2d 687 [5th Cir. 1971]; Rowe v. General Motors Corp., 457 F.2d 348 [5th Cir. 1972]. In accordance with these decisions and under the doctrine of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 [1973], once the plaintiff has established a prima facie case by setting forth statistics of this kind the burden is on the employer to sufficiently explain the disparity in hiring; conclusory statements that the employer never discriminated in hiring is insufficient to satisfy this burden. As stated in *McDonnell,* supra, "The burden then must shift to the employer to articulate some legitimate, non-discriminatory reason for the respondent's rejection." (p. 802, 93 S.Ct. p. 1824). We are of the opinion that the Defendant's response to the Plaintiffs' motion for summary judgment fails to address this burden at all, let alone rebut the Plaintiffs' evidence.

The response of the Defendant raises eight issues of defense, as follows:

1.

■ Neither of the named Representative Plaintiffs is currently in the employ of the Defendant. This is not a contested issue of fact. The Plaintiffs admit that both the representative party Plaintiffs have left the employ of Defendant and the question of whether or not their termination from employment was voluntary or forced by discriminatory employment practices of the Defendant is not an issue before us at this time. This is a matter of law concerning standing and it has been held that a former employee may bring an action to enforce rights under this statute claimed to have been infringed. In Hackett v. McGuire Bros., Inc., 445 F.2d 442 [3rd Cir. 1971] this contention was rejected;

"The national public policy reflected . . . in Title VII . . . may not be frustrated by the development of overly technical judicial doctrines of standing or election of remedies. If the plaintiff is sufficiently aggrieved so that he claims enough injury in fact to present a genuine case or controversy in the Article III sense, then he should have standing to sue in his own right and as a class representative." (pp. 446, 447).

The Circuit Court continued:

"A person claiming to be aggrieved may never have been an employee of the defendant. Indeed the Act forbids discrimination not only by employers, 42 U.S.C. § 2000e–2(a)(2), but also by potential employers, 42 U.S.C. § 2000e–2(a)(1), by labor organizations, 42 U.S.C. § 2000e–2(c), and by employment agencies, 42 U.S.C. § 2000e–2(b). An aggrieved person obviously is any person aggrieved by any of the forbidden practices. (pp. 445–446).

An interesting commentary on the argument asserted to this court was made in Reed v. Arlington Hotel Co., Inc., 476 F.2d 721 [8th Cir. 1973]:

" . . . if this kind of an individual [a discharged employee, not seeking

reinstatement] would be prevented from bringing class actions as the rules permit, there would be a windfall for the employer, and when any such matter was coming up, all they would have to do is discharge the employee . . . ." (p. 723).

### 2.

■ The Defendant argues that the representative party Plaintiffs were offered "Claims Adjuster" status and has filed evidence to this effect. This is not denied by Plaintiffs but they contend that the terms of the offer were unacceptable and were made after the charges of discrimination were filed in this case with the United States Equal Employment Opportunity Commission in 1971. We find this to be a disputed issue of fact which may be relevant to the question of damages of the representative party Plaintiffs, but irrelevant to the question of violation of the statute which is before us. Under all circumstances, it is shown by the evidence that the offer of "Claims Adjuster" status was made long after the effective date of the statute in question, after both representative Plaintiffs had been employed in the positions of "Claims Representatives" for several years, and after the filing of the Complaints before the EEOC in this matter.

### 3.

■ Defendant claims that there is a dispute as to the content of conversations between representatives of the Company and a representative of the Pennsylvania Human Relations Commission. This alleged conversation bears on the Company's motive and intent in offering "Claims Adjuster" status to the named-Plaintiffs at the time that it did. We find this completely immaterial to the issue before us at this time because the offer of Claims Adjuster status was not made until the alleged discriminatory practices in violation of Title VII of the Act had continued for several years and the issue had been raised by a Complaint to the Equal Employment Opportunity Commission by the named Plaintiffs.

### 4.

■ The Defendant contends that there is a disputed issue of fact on the question of whether or not the qualifications and entrance requirements for the position of "Claims Adjuster" are substantially different from those of "Claims Representative". Although with respect to the duties and responsibilities of each position which we have previously designated as the "equal pay" issue, not before the Court on this Summary Judgment motion, nevertheless we are concerned at this time with whether or not qualified female applicants were excluded from the position of "Claims Adjuster" and its subsequent promotional ladder. The statistical evidence shows that of more than 2,000 persons hired for the position of "Claims Adjuster" up through 1970, not one was female. The Defendant's own representatives have admitted that the representative Plaintiffs in this case were qualified for the position of "Claims Adjuster" at the time of original hiring. Therefore, we find that the Defendant has not met the burden of showing why no female personnel were hired for the "Claims Adjuster" position during the period following the effective date of Title VII until sometime after August 1971 and subsequent to the filing of complaints in the within matter. Plaintiffs contention is further supported by evidence that no female employees occupied the supervisory position of "Claims Supervisor" in the Company which were filled from the ranks of the "Claim Adjusters" until at least 1970. If the jobs were substantially dissimilar as the Defendant claims, the differential in starting salary may be justified but the total exclusion of women from entry into the higher paid "Claims Adjuster" position would remain as a discriminatory practice, and the promotional policy of the company in drawing all of its supervisory personnel from the ranks of the exclusively male "Claims Adjusters" con-

tinued and emphasized the discriminatory effect of the policy. Therefore, we find that the Defendant's argument of a difference in the qualifications or duties of the two positions is immaterial to the Plaintiffs' charge that women were discriminated against in the selection of persons to fill the "Claim Adjuster" position. The company has offered no evidence of any bonafide occupational qualification to justify the complete exclusion of women for this position for over a period of five years, particularly in view of its later determination that some women "Claims Representatives" were qualified for and were offered these positions.

### 5.

The Defendant argues that it is not clearly established by the evidence that a large number of Defendant's female employees were desirous of and qualified for better positions. We cannot see the materiality of this argument to the question presently before us. The undisputed evidence establishes that after charges were filed in this case, the Defendant did interview its "Claims Representatives" and that 10% of them were offered and accepted positions as "Claims Adjusters". It was further established by testimony of a Company representative that the Company considered one-third of its women "Claims Representatives" to be qualified for the position of "Claims Adjuster". We fail to see how these facts alter the statistical evidence that of the more than 2,000 "Claims Adjusters" hired between 1965 and 1970 none were women, that all of the "Claims Representatives" hired during this period were women, that no woman in the job classification of "Claims Representative" was ever promoted to the supervisory position of "Claims Supervisor" during this period; that the Company deliberately engaged in the recruitment of women for the "Claims Representative" position and represented the "Claims Adjuster" position to be solely a position for male applicants.

### 6.

The Defendant objects to using the import of the recruiting brochures which were offered in evidence by Plaintiffs and has shown that they have since been superceded by new recruiting literature that is not sex oriented. However, in this matter as in several other matters offered in defense in this case the evidence shows that the Company policy changed after having been continued for a period of approximately five years from the effective date of Title VII and after the threat of the instant litigation became imminent. While the change in Company policy may affect the question of the amount of damages for which it may be liable, we cannot see what effect it has on the liability of Defendant for its policy from and after July 2, 1965

### 7.

The Defendant disputes the Plaintiffs' statement that Defendant discouraged acceptances for the offer given to female "Claims Representatives" for re-classification to the position of "Claims Adjuster". We do not find this to be a dispute on a material issue of fact. Whether or not the company discouraged its female "Claims Representatives" from accepting the offered position of "Claims Adjuster", after that occupational classification was opened to women is immaterial to the issue of whether or not the Company practiced discrimination in its employment policies from and after July 2, 1965.

For the purposes of this motion we may assume that the Company did not discourage its female employees from accepting offers to transfer to the classification of "Claims Adjuster."

### 8.

The Defendant disputes the inferences which the Plaintiffs draw from the facts that no women were promoted to the positions of Branch Office Claims Manager and above. Whether or not there is a dispute from these inferences the undisputed fact remains that no women in the

Defendant's organization were promoted to or held these positions, and the Defendant has failed to come forward with any evidence to explain or refute the disparity in promotional practices.

## II.

A second issue presented by Plaintiffs' motion for summary judgment may be broadly categorized as the maternity leave issue. This in turn is divided into two sub-issues which we label as

(a) the maternity leave conditions of employment and

(b) the income protection plan as applied to maternity leave.

(a) *Maternity leave policy.*

Until March 1967, the Company policy was to terminate the employment of a pregnant employee at the end of her sixth month of pregnancy. Thereafter, until September 1970 the policy was to terminate an employee after the eighth month of pregnancy. An employee so terminated could be re-employed, at the sole discretion of the Company, if she re-applied for employment after the birth of her child and if there was a position available.

In September 1970, Company policy was changed to require pregnant employees either to terminate employment or to take a leave of absence at the end of the eighth month and to return to work either within six months of the date of termination of employment or three months from date of delivery, whichever comes first.

In November 1971, Company policy was again changed to permit an employee to work for as long as her physician certifies her ability to work prior to commencing a maternity leave of absence.

(b) *Income Protection Policy.*

The Company provides as a fringe benefit of employment an Income Protection Plan which provides for the payment of income during periods of disability. This plan is funded by insurance benefits. The only long term disability for which no benefits are provided is pregnancy. Furthermore, the Defendant's health insurance plan provides coverage for children of employees who are working for the Company at the time of the birth of the child, and this excludes from coverage the child of an employee who is absent on a maternity leave of absence at the time of the birth of the child.

There is no disputed issue of fact as to the provsions of the maternity leave policies and the fringe benefit coverage of Defendant Company. The question presented to us is solely a matter of law as the application of Title VII to these undisputed facts.

A threshold question raised by Defendant is that the Plaintiffs have not fulfilled the statutory requirement of exhaustion of the administrative remedy, 42 U.S.C. § 2000e–5(e) because the charges filed by these Plaintiffs with the EEOC never mentioned this aspect of the complaint. The policy of the statute is to give the EEOC an opportunity to investigate and conciliate charges of discrimination.

The strongest case urged by Defendant Company is Tedford v. Airco Reduction Co., 4 F.E.P. Cases 406 [5th Cir. 1972], where the Court of Appeals reversed the dismissal by the District Court of a claim for discriminatory hiring practices because of mootness. The Appeals Court held that the subsequent hiring of plaintiff did not extinguish plaintiff's claim for back wages. However, the Court of Appeals did sustain the dismissal of claims of a discriminatory seniority system and discriminatory job assignments because.

"the only factual allegation in Tedford's EEOC complaint was that Airco had refused to hire him as a truck driver because of his race."

\* \* \* \* \* \*

"But giving this factual allegation the most generous construction possible, we still are unable to conclude that the investigation could properly have

extended to Airco's seniority system, the driver lists, and the like. A charge filed before the EEOC is not a plenary charter for a Commission investigation of every aspect of a company's employment practices. The conclusion is unavoidable that the EEOC has never been called upon to investigate these practices, and accordingly that litigation of their validity in federal court is premature." 4 F.E.P. Cases, p. 409.

However, this was the same Circuit Court that decided Sanchez v. Standard Brands, 431 F.2d 455 [5th Cir. 1970], and the *Tedford* court gave due regard to the *Sanchez* doctrine.

However, the courts have not restricted a plaintiff's suit under 42 U.S.C. § 2000e–5(e) to the specific issues raised before the EEOC, nor to the specific findings of the EEOC.

"Respondent satisfied the jurisdictional prerequisites to a federal action (i) by filing timely charges of employment discrimination with the Commission and (ii) by receiving and acting upon the Commission's statutory notice of the right to sue, 42 U.S.C. §§ 2000e–5(a) and 2000e–5(e). The Act does not restrict a complainant's right to sue to those charges as to which the Commission has made findings of reasonable cause, and we will not engraft on the statute a requirement which may inhibit the review of claims of employment discrimination in the federal courts. . . . and the courts of appeal have held that, in view of the large volume of complaints before the Commission and the nonadversary character of many of its proceedings 'court actions under Title VII are de novo proceedings and . . . a Commission "no reasonable cause" finding does not bar a lawsuit in the case.' Robinson v. Lorillard Corp., 444 F.2d 791, 800 [C.A.4, 1971]; Beverly v. Lone Star Lead Construction Corp., 437 F.2d 1136 [C.A.5, 1971]; Flowers v. Local 6, Laborers International Union of North America, 431 F.2d 205 [C.A.7, 1971];

Fekete v. United States Steel Corp., 424 F.2d 331 [C.A.3, 1970]." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798–799, 93 S.Ct. 1817, 1822, 1823, 36 L.Ed.2d 668 [1973].

In Sanchez v. Standard Brands, Inc., cit. supra, it was explained that in filing a charge with the EEOC an aggrieved person is supplied with a simple one-page charge form in which a row of boxes is provided to check the category of discrimination. We have as Exhibits in the present case the Notice of Charge which the EEOC gave to Defendant Company for each case which indicates "Basis of Discrimination—Sex", and "Nature of Charge—Promotion—Terms and Conditions." The *Sanchez* court found that no charging party should be barred from the assertion of a charge because of the technicality of his description.

"Surely the only procedural requirement which should confront a Title VII complainant is the requirement that he state, within the ninety-day period, *facts* sufficient to trigger a Commission investigation. 431 F.2d p. 462.

*Sanchez* continues:

"At least one district court in this circuit has addressed itself to the question, however, and in our judgment it responded to the question by giving the correct answer. In King v. Georgia Power Co., N.D.Ga.1968, 295 F. Supp. 943, Judge Smith held that the allegations in a judicial complaint filed pursuant to Title VII 'may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission.' 295 F. Supp. at 947. In other words, the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." 431 F.2d p. 466.

It appeared from oral argument that Defendant, although it had received the "Notice of Charge of Employment Dis-

crimination", had not seen copies of the original charges filed by Plaintiffs with the Commission before the argument. It appeared that they had never been requested. They were supplied to the court and counsel the day following the argument on this motion. The charge of Plaintiff Mari Ross states, inter alia, "During interview for position as claims representative was subjected to questions regarding marital situation and birth control." Furthermore, the Plaintiffs were required to pursue their charges through an appropriate state agency, the Pennsylvania Human Relations Commission, which on July 1, 1971, sent to Defendant a Complaint which recited, inter alia:

> "The complainants further allege that female applicants, as a condition of hire, are subjected to inquiries about anticipated marriage and family size, while men are not similarly evaluated as a condition of hire."

*(Aune, Deposition, Exhibition 1).*

The court believes that the Representative Plaintiffs have properly employed the administrative procedures of Title VII which are a prerequisite to suit in the district court, they have properly raised the issue of sex discrimination in the "terms and conditions" of employment, that they specifically raised allegations of discrimination in respect to marital status and family planning sufficient to satisfy the administrative investigation requirement for raising the specific question of sex discrimination in maternity leave and pregnancy disability income policies in the present lawsuit.

As a point of departure in considering the merits of Plaintiffs' charges of sex discrimination with respect to Defendant's maternity leave and pregnancy disability income protection policies it might appear to the lay mind that we are treading on the brink of a precipice of absurdity. Perhaps the admonition of Professor Thomas Reed Powell to his law students is apt; "If you can think of something which is inextricably relat-ed to some other thing and not think of the other thing, you have a legal mind."

We are dealing with a statute enacted by the Congress of the United States which says:

> "It shall be unlawful employment practices for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's . . . sex; or
>
> (2) to limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).

The defendant argues that its policies with regard to maternity leave and income protection for disability excluding pregnancy are not sex discriminatory because pregnancy is "sui generis" and thus subject to special treatment.

We believe that the court may take judicial notice of certain well known facts and statistics to illustrate the problem. We have taken our statistics from the United States Census figures as published in the 1974 edition of the World Almanac. In 1970, according to the census figures, there were 105,000,000 women and 100,000,000 men in the United States. In 1972 there were 31,000,000 women and 51,000,000 men, sixteen years of age and upwards, employed in the United States. Women between the ages of fourteen through forty-four amounted to 43.5% of the total female population or 45,675,000 women, which we equate with the childbearing age. There is a necessary overlapping of the 31,000,000 women in the work force sixteen years of age and older, and the 45,000,000 women in the childbearing ages of fourteen to forty-four. There were 3,191,000 live births in the United States in the year ending June 30, 1973 which produces a

birth rate of about fifteen per 1,000 of total population, but a fertility rate of sixty-nine births per 1,000 women fifteen to forty-four years of age. We recognize that more precise statistics are available but we are not concerned with minutiae and only recite these figures to illustrate the scope of the problem. Pregnancy is a natural condition, it is an expectable condition, it is a statistically foreseeable condition, and ultimately it is a necessary condition. It is a condition limited to women, not by statutory law or custom, but by biological law. If three-eighths of our employee working force consists of women, and their age group necessarily overlaps in large measure the childbearing age group, pregnancy is certain to occur in a statistically expectable number of employees. We have no doubt that a large insurance company is well aware of the precise statistics. We further note from this case that the defendant's recruiting policies for female technical employees in its claims department was aimed at young women finishing their college education, and that its promotional policy was to advance personnel within its own ranks and not draw upon outside sources. This policy would only increase the incidence of young women of childbearing age among the female employees of a growing business organization such as Defendant, which hired over 2,000 new female claims representatives in a five year period.

■ Because pregnancy is a natural, expectable, and societally necessary condition, which is certain to occur in a statistically predictable number of women in the labor force, we see no merit in Defendant's argument that it may be excluded from equality of treatment in conditions and benefits of employment because it is a voluntary condition. Whether voluntary or not, it occurs with certainty and regularity. The distinction drawn between one hiring policy for men and another for women—each having pre-school age children—was rejected by the Supreme Court in Phillips v. Martin Marietta Corp., 400 U.S. 542, 544, 90 S.Ct. 496, 27 L.Ed.2d 613 [1971] where there was no showing that the condition in question is a bona-fide occupational qualification necessary to the operation of that particular business or enterprise.

The United States Equal Employment Opportunity Commission which is the administrative body created by Title VII to administer the Act, has issued the following Guidelines with respect to the question at issue:

§ 1604.10 Employment policies relating to pregnancy and childbirth.

(a) A written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy is in *prima facie* violation of Title VII.

(b) Disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom are, for all job-related purposes, temporary disabilities and should be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment. Written and unwritten employment policies and practices involving matters such as the commencement and duration of leave, the availability of extensions, and accrual of seniority and other benefits or temporary disability insurance or sick leave plan, formal or informal, shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities.

(c) Where the termination of an employee who is temporarily disabled is caused by an employment policy under which insufficient or no leave is available, such a termination violates the Act if it has a disparate impact on employee of one sex and is not justified by business necessity.

29 C.F.R. Labor, Chapter XIV, Part 1604, As Amended (As of March 31, 1972).

§ 1604.9 Fringe benefits.

(a) "Fringe benefits," as used herein, includes medical, hospital, accident, life insurance and retirement benefits; profit-sharing and bonus plans; leave; and other terms, conditions, and privileges of employment.

(b) It shall be an unlawful employment practice for an employer to discriminate between men and women with regard to fringe benefits.

29 C.F.R. *idem*.

■ We give full recognition to the principle urged upon us that the EEOC Guidelines, 29 C.F.R. § 1604.10, effective April 5, 1972, do not have the force of law in the sense that the "regulations" or "substantive rules" of an administrative body authorized by statute to promulgate regulations to implement existing law have a binding effect. We also recognize that the Guidelines are interpretive statements of what the administrative officer thinks the regulations mean. Gibson Wine Co. Inc. v. Snyder, 90 U.S.App.D.C. 135, 194 F.2d 329 [1951]. We are not compelled to follow them, but some deference is due. Espinoza v. Farah Manufacturing Co., 462 F.2d 1331, 1335 [6th Cir. 1972].

Our own Court of Appeals states it more strongly:

"Such an administrative interpretation is entitled to great deference. Griggs v. Duke Power Co., 401 U.S. 424, 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158 [1971]; Udall v. Tallman, 380 U. S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 [1965]. That the guideline was not promulgated until after this suit was initiated is of no moment. Rights which came into being when the Act was passed are not abrogated by administrative interpretation. Bartmess v. Drewrys U.S.A., Inc., 444 F.2d 1186 [C.A.7], cert. denied, 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 [1971]."

"A reading of the statute convinces us that the commission's interpretation furthers the legislative purpose of the Act and is consistent with the plain meaning of the language employed.

'Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.' Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1198 [C.A.7], cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 [1971]." Rosen v. Public Service Electric and Gas Co., 477 F.2d 90 [3rd Cir. 1973], at pp. 94–95.

The only current provision of the Defendant's maternity leave policy under attack is the provision that the employee who is granted a leave of absence for maternity must return to work on a date certain or be terminated from employment. Plaintiffs' Complaint is zeroed in on the target that this limitation on leave of absence for temporary disability is only applied to maternity cases. There is no such requirement for any other disability.

Because state and local governments were exempted under Title VII until 1972, there are few Title VII cases involving pregnancy that give us guidelines, but the question has arisen frequently under cases presenting claims of denial of equal protection or denial of civil rights under color of state authority. We believe that Title VII standards are more compelling on a private employer in view of the express statutory mandate upon employers and the absence of the question of a "rational basis" for classification by which a state statute is measured. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 [1970]. While a fixed state policy of classification may survive an equal protection attack it may still be violative of Title VII. See Schattman v. Texas Employment Commission, 459 F.2d 32 [5th Cir. 1972], and Newmon v. Delta Airlines, Inc., 475 F.2d 768 [5th Cir. 1973].

A district court in the Fifth Circuit has recognized that:

"*Schattman*, . . . turned upon a divided Appellate Court's interpretation of the federal statute as it then read on the question of its exclusion from coverage of state employers and employees." Vick v. Texas Employ-

ment Commission 6 EPD 5990 [S.D. Tex. Aug. 30, 1973].

However, the *Vick* case found this impediment to jurisdiction removed by the 1972 Amendment to Title VII, and proceeded to find that the state's denial of unemployment benefits on the grounds that the last trimester of pregnancy rendered a woman unavailable for work, violated the provisions of Title VII.

"While the expectancy of life confined and incident to female pregnancy involves many delicacies of personal, institutional and societal interest, Roe v. Wade, 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147] 41 L.W. 4231 (January 22, 1973), such a natural and necessary female condition cannot be a basis for categorical discrimination in light of Phillips and its plain interpretation of Title VII of the Act." *Vick*, cit supra, 5 EPD p. 5992.

Nevertheless, we can take some guidelines from the Equal Protection Clause cases dealing with pregnancy.

Judge Brown in his dissent in Phillips v. Martin Marietta Corp., 416 F.2d 1257 [5th Cir., 1969], vacated *per curiam* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 [1972] noted with respect to that case, where women with pre-school age children were denied employment, but not men:

"The distinguishing factor seems to be motherhood versus fatherhood. The question then arises: Is this sex-related? To the simple query the answer is just as simple: Nobody—and this includes Judges, Solomonic or life tenured—has yet seen a male mother. A mother, to oversimplify the simplest biology, must then be a woman". 416 F.2d p.1259.

To the argument that pregnancy is a voluntary status, the court in Buckley. v. Coyle Public School System, 476 F.2d 92 [10th Cir.1973] says:

"The fact, if it be a fact, that pregnancy is a voluntary status really has nothing to do with the question. The point is that the regulation penalizes the feminine school teacher for being a woman and, therefore, it must be condemned on that ground." 476 F.2d at p. 95.

The Court of Appeals reversed the District Court's dismissal and remanded the case to the District Court for determination of a compelling state interest to justify the regulation.

In Green v. Waterford Board of Education, 473 F.2d 629 [2nd Cir.1973], the Court of Appeals reversed a District Court's dismissal of a complaint alleging that an inflexible maternity leave policy denied equal protection. Even though the District Court had found a rational basis for the school board's action, the Court of Appeals found that the state's interests were not sufficiently promoted by rule to justify the arbitrary and inflexible regulation applied to pregnancy as distinguished from other disabilities.

"The heart of plaintiff's case is that disqualifying a physically capable woman from working because of a condition related solely to her sex is unconstitutionally discriminatory. Plaintiff admits the obvious, that men do not become pregnant, but points out that men, being human, are also subject to crises of the body, some of which, like childbirth, give ample warning: A cataract operation or a prostatectomy, for example, may be planned months ahead. Because male teachers are not forced by defendant Board to take premature leave because of a known forthcoming medical problem, female teachers should not be treated differently. Thus stated, the argument is persuasive, even compelling. One realizes with a shock what so many women now proclaim: Old accepted rules and customs often discriminate against women in ways that have long been taken for granted or have gone unnoticed." (p. 634).

See also the following Equal Protection clause cases involving maternity leave: LaFleur v. Cleveland Board of Education, 465 F.2d 1184 [6th Cir.1972], cert. granted 411 U.S. 947, 93 S.Ct.1921, 36 L.Ed.2d 408, but Cf. Cohen v. Chester-

field County School Board, 474 F.2d 395 [4th Cir.1973], cert. granted, 411 U.S. 947, 93 S.Ct. 1925, 36 L.Ed.2d 408.

Defendant has interposed a defense of good faith reliance upon an administrative interpretation, particularly in its defense on the income protection exclusion policy here. This may be a matter to consider when the questions of affirmative relief or back pay are determined but we cannot see its application to the immediate question of the inflexible maternity leave standard. During the period prior to the Guidelines published in March 1972, there were no guidelines or opinions issued by the EEOC. 42 U.S.C. § 2000e–12(b) (Sec. 713(b) of the Act) provides that "no person shall be subject to any liability or punishment for or on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or commission complained of was in good faith, in conformity with and in reliance upon any written interpretation or opinion of the Commission."

We do not believe that the various opinion letters referred to in the brief of *amicus curiae* United States Chamber of Commerce, with respect to the inclusion of maternity benefits in an insurance plan meet the requirements of Sec. 713; there is no evidence that defendant relied upon them, they were not addressed to the defendant, and do not otherwise conform to the requirements of a written opinion under which the defense of reliance may be asserted. Local 189 United Papermakers and Paperworkers, etc. v. United States, 416 F.2d 980 [5th Cir.1969]; Sprogis v. United Air Lines, Inc., 444 F.2d 1194 [7th Cir.1971].

The maternity leave policy of the company which since 1970 has granted a leave of absence for six months from the last date of work before delivery, or for three months from date of delivery, whichever comes first, has no relation to the fitness of any individual female to perform the functions of her job.

 The defendant has not alleged, nor has it offered any evidentiary material to establish that there is a disputed issue of fact dependent upon a bona fide occupational qualification. Such a bona fide occupational qualification is a defense to a charge of discrimination where sex is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise. This has been narrowly construed by the courts. In Weeks v. Southern Bell Telephone and Telegraph Company, 408 F.2d 228 [5th Cir.1969] the Court held this must give the employer "a factual basis for believing that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." In Rosenfeld v. Southern Pacific Co., 444 F.2d 1219 [9th Cir.1971] the court held the exclusion of women justified only when "the sexual characteristics of the employee are crucial to the successful performance of the job, as they would be for the position of a wet-nurse." Under *Rosenfeld*, if one woman can do the job the employer cannot impose a blanket rule denying all women the opportunity.

Under the company policy any female who cannot return to her job within three months of delivery of her child is automatically terminated. No other disability is cause for such automatic termination. "For a woman, however, the effects of pregnancy and pregnancy-related illness are debilitating in much the same way as the physical and mental conditions that are included within the scope of the disability insurance program." Aiello v. Hansen, 359 F.Supp. 792 [N.D.Cal.1973].

 We conclude, as a matter of law, that the maternity leave policy in effect in Defendant Company at the present time and since September 1970 in the respect in which it requires a female to return to work within three months of the date of delivery of her child, or six months from the beginning of her maternity leave, whichever date is earlier, or face termination of employment, is violative of Sec. 703, of Title VII of the Civil Rights Act of 1964, as amended, in that such policy discrimi-

**1162**

nates against female employees on the basis of sex.

Because only this present policy is still in existence, injunctive relief as to this practice is appropriate at this time. ▇▇▇ We further find that all prior company policies in effect since July 2, 1965, which compelled pregnant female employees to leave employment at a fixed period of pregnancy before delivery were likewise violative of the Act, and the company policy in effect since July 2, 1965 which denied reemployment because of pregnancy and maternity were violative of the Act. Because these practices have ended there is no need for injunctive relief, and the question of the intentional nature of the violation and the appropriate relief will be considered in a subsequent stage of these proceedings.

▇▇ Some additional considerations must be weighed with respect to plaintiffs' claim that the Income Protection Plan of Defendant company is discriminatory to female employees. The Company provides its employees with a contributory insurance plan for continuation of income for a "long term illness", i. e. an illness requiring treatment by a doctor of eight or more calendar days which causes absence from work. Such "benefits are not payable for disability due to occupational injury or to sickness covered under Workmen's Compensation Insurance; for disability due to pregnancy; for a disability in excess of 104 weeks; or for a disability during which you were not treated by a physician licensed to practice medicine."

Pregnancy is the only disability, not within the other exceptions, not covered by the Income Protection Plan. Pregnancy is a condition limited to women. Conditions limited to men, such as prostate troubles, are not excluded, nor is any exclusion provided for a number of illnesses whose incidence among males is greatly predominant (i. e. gout 19 to 1; the Merck Manual, 10th ed. 1961).

The brief of the United States Chamber of Commerce as amicus curiae cites cost of the program if pregnancy were included, as a justification for exclusion.

We must emphasize the distinction made by the Guidelines, § 1604.10(b) that it is "disabilities caused or contributed by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom" which for job-related purposes are to be treated as temporary disabilities. They do not cover leave for child rearing, but only for job disability. No evidence has been presented to us by Defendant as to the average duration of pregnancy disability. Again, we have a difficult time in freeing ourselves from stereotype thinking. We note that the Defendant's policy for maternity leave prior to delivery has accommodated itself from a fixed number of months prior to delivery to the recognition that an employee may work prior to delivery as long as she is able to do the job. Return to work may be made as soon after delivery as she is able to do the job. We may assume from a general knowledge of the conditions of life, that in the normal or usual pregnancy, the period of disability will be relatively short. There is nothing in this record to show, and nothing in our general experience with life indicates that the job-related incidence of disability for pregnancy is any greater or any less than that for a prostatectomy.

The EEOC Guidelines provide, § 1604.9 Fringe Benefits, (e):

"It shall not be a defense under Title VII to a charge of sex discrimination in benefits that the cost of such benefits is greater with respect to one sex than the other."

▇▇ While cost may be a business purpose, and certainly to add pregnancy disability to the insurance program will cost more, it can only be a defense in a Title VII action where

" . . . there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact, the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available

no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact. (footnotes omitted.) Robinson v. Lorillard Corporation, 444 F.2d 791, 798 [4th Cir.1971].

With respect to the argument of increased costs there is no statutory requirement that Defendant company offer any particular disability benefits, in any specific amount, or of any particular duration. The only requirement is that there be no inequality based on sex. Adjustments in the benefit plan to achieve equality are a recognized means of achieving that end. Rosen v. Public Service Electric Co. cit supra (p. 95); Hays v. Potlatch Forests, Inc., 465 F.2d 1081 [8th Cir.1972].

> "The increased costs could be accommodated quite easily by making reasonable changes in the contribution rate, the maximum benefits allowable, and the other variables affecting the solvency of the program." Aiello v. Hansen, 359 F.Supp. 792, at p. 798 [N.D.Cal.1973].

 A final requirement for a finding of violation of Title VII is that the court must find that defendant "has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint" in order to issue an injunction or to order such affirmative action as may be appropriate. While we are not now concerned with any question of relief in which the questions of back pay or reinstatement may be considered, certain continuing policies of defendant are subject to immediate injunctive relief, and require a finding of intentional action. Defendant has raised no question of intentional violation, except as to its defense of good faith reliance on administrative interpretation which we have found insufficient. The term "intentional" in this Act means that the Defendant intended to do what it did, not that there was a wilful and deliberate intention to violate the law.

". . . intentional unfair employment practices are those engaged in deliberately and not accidentally. No willfulness on the part of the employer need be shown to establish a violation of Sec. 706(g)." Kober v. Westinghouse Electric Corp., 408 F.2d 240, 246 [3rd Cir.1973].

We, therefore, find that the violations of Title VII of the Act herein charged were intentional within the terms of that statute.

We, therefore, conclude that as to the issues raised by Plaintiffs' Motion for Partial Summary Judgment, there is no genuine issue as to material fact and that summary judgment interlocutory in character should be entered on those issues.

Because the evidentiary materials show that at certain times subsequent to the effective date of the Act, or subsequent to the filing of the administrative charge or the within Complaint the Defendant has ceased or discontinued the . discriminatory practice, injunctive relief is not appropriate as to those practices. Kober v. Westinghouse Elec. Co., supra, p. 250.

As to continuing practices which violate Title VII preliminary injunctive relief at this time is appropriate.

The question of other affirmative relief for past actions is not now before us. The Court is mandated to issue "such affirmative relief as may be appropriate". Kober, cit supra. This will depend upon the evidence to be presented on the individual claims, which may be considered at the time of trial of the "equal pay" issue not here considered.

## ON MOTION TO RECONSIDER

The Defendant Liberty Mutual Insurance Company has moved the court to reconsider that portion of its Order of January 9, 1974, that found that the Defendant's policy of requiring female employees to return to work within three months of delivery or be terminated and its policy of denying the benefits of the disability income protection plan to fe-

male employees for any disability related to pregnancy or childbirth are violations of Title VII of the Civil Rights Act of 1964.

Defendant brings to our attention the decision of the Northern District of Georgia in Newmon v. Delta Air Lines, Inc., Civil Action No. 15681, issued December 31, 1973 of which this court was unaware at the time of its January 9, 1974 order. We have considered that Opinion and its Findings which, in many parts, are in complete accord with the Findings of this Court. However, we do disagree with the Finding of that court that pregnancy is not a "disability".

We do note that the decision in Newmon v. Delta Air Lines, Inc. was made after a consideration of a great deal of evidentiary material presented by both parties in that case concerning working conditions, the type of work performed, the preference of the woman, the accessibility of a hospital, and, of course, the possibility of complications to both mother and child in pregnancy cases. The court also considered whether or not the defendant Airlines maternity leave policy was "reasonably necessary to the normal operation of the airlines business".

The remainder of Defendant's motion continues the argument that it is impossible for Defendant to present any statistical material of the cost of extending disability benefits to pregnancy because no statistics are available. Whether such statistics are available or not, the Defendant made no attempt to produce any such evidence before this court. The court cannot understand why the disability from performing work due to pregnancy or childbirth cannot be medically determined in the same way that disability from performing work is medically determined in all other disability cases. For a half century or more in this country, and for over a century in European countries, these matters are decided in hundreds, if not thousands, of cases daily.

Finally, the Defendant argues that "because employees can, in some situations, make as much or more money by receiving disability income it can be assumed that females on pregnancy leave of absence will remain at home longer than normal." The Defendant presented absolutely no evidence to support this argument and as a trial judge who has seen hundreds of cases of soft tissue damage arising from the so-called "whip lash" type of injuries which produce few observable objective symptoms the court sees no basis for assigning the tendency to malinger as a sex-related characteristic. If, as defendant suggests, the employee can make as much or more money on disability than at work be true, then the fault lies with the particular insurance plan and not with the female sex. The motion for reconsideration will be denied.

In its Order the court stated it would enjoin the continuance of practices which the court found to be in violation of Title VII. The Plaintiffs were invited to submit the form of the injunction order and the Defendant has filed Notice of Appeal and asked for stay of any injunctive order. Under these circumstances the court will withhold the issuance of the injunctive order and amend the Order previously issued under the provisions of Fed.R.Civ.P. 54(b), as follows:

And now this 20th day of February, 1974, it is directed that final judgment be entered in favor of Plaintiffs that Defendant's policy of requiring female employees to return to work within three months of delivery of a child or be terminated is in violation of the provisions of Title VII of the Civil Rights Act of 1964; that Defendant's policy of denying disability income protection plan benefits to female employees for disabilities related to pregnancies or childbirth are in violation of Title VII of the Civil Rights Act of 1964 and that it is expressly directed that Judgment be entered for the Plaintiffs upon these claims of Plaintiffs' Complaint; there being no just reason for delay.